Filed 10/14/21  Elfin Forest Harmony Grove Town Council v. County of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ELFIN FOREST HARMONY GROVE TOWN COUNCIL et al., | D077611, D078101 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2018-00042927-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Appellant, | |
| RCS-HARMONY PARTNERS, LLC, | |
| Real Party in Interest and Appellant. | |

CONSOLIDATED APPEALS from a judgment of the Superior Court of San Diego County, Katherine Bacal, Judge.  Affirmed in part, reversed in part and remanded with directions.

Hecht Solberg Robinson Goldberg & Bagley and Beth Abramson, Sadaf Behdin; Richard A. Schulman, for Real Party in Interest and Appellant.

Shute, Mihaly & Weinberger and Winter King, Tori Gibbons for Plaintiffs and Respondents.

In these consolidated appeals,[1] appellant and real party in interest RCS-Harmony Partners, LLC challenges an order granting the writ of mandate of respondents Elfin Forest Harmony Grove Town Council, Endangered Habitats League, and Cleveland National Forest Foundation, which challenged the County of San Diego's (County) approval of the Harmony Grove Village South project (the Project) and certification of a final Environmental Impact Report (EIR) for the Project under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[2] The superior court ordered County to set aside its approval of the Project, finding the EIR relied on unsupported greenhouse gas mitigation measures and failed to address certain fire safety issues or relied on unsupported fire evacuation measures. It found County failed to proceed in the manner required by CEQA by not including certain forecasts or analyses relevant to

_____

[1] Appellant filed notices of appeal of both a February 20, 2020 minute order granting the requested writ of mandate and a July 21, 2020 judgment that incorporated the minute order, specified the terms of a writ of mandate, and disposed of all issues. This court consolidated the appeals. County had also appealed the order, but dismissed its appeal and withdrew from the case.

[2] Public Resources Code sections 21000-21177 codify CEQA provisions. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 507, fn. 1 (*Sierra Club*).) Undesignated statutory references are to the Public Resources Code. Regulations set forth in title 14 of the California Code of Regulations guide CEQA's application; those are often referred to as the CEQA Guidelines (Guidelines). (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 (*Vineyard Area Citizens*).)

2

air quality impacts and failed to show the Project was consistent with a San Diego Association of Governments (SANDAG) regional plan for growth and development. The court finally found the Project inconsistent with County's General Plan's requirement that developers provide an affordable housing component when requesting a General Plan amendment, and also conflicted with a policy of the Elfin Forest and Harmony Grove San Dieguito Community Plan (Community Plan) that Elfin Forest development be served only by septic systems for sewage management.

Appellant contends the court erred by its ruling. It contends: (1) the Project's greenhouse gas emission mitigation measures are supported by substantial evidence and also satisfy the performance standards set forth by this court in *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467 (*Golden Door*), making them materially different from the non-CEQA-compliant mitigation measure M-GHG-1 invalidated in *Golden Door*; (2) the EIR adequately addressed fire safety and evacuation; (3) the EIR properly evaluated the Project's impact on air quality and land use plans; (4) the Project's approval was consistent with County's General Plan policy regarding affordable housing; and (5) the trial court incorrectly applied a septic policy to the Project.

We conclude the Project's greenhouse gas mitigation measures M-GHG-1 and M-GHG-2 suffer from many of the same flaws as M-GHG-1 in *Golden Door, supra,* 50 Cal.App.5th 467 in that they lack objective performance criteria to ensure the effective and actual mitigation of greenhouse gas emissions, and also improperly defer mitigation. However, we agree with appellant that the EIR adequately addressed fire safety and evacuation, as well as the Project's consistency with County's regional air quality and transportation/development plans. We hold the Project does not conflict with

3

the Community Plan, but that County erred by finding it is consistent with its General Plan, which requires developers to provide an affordable housing component when seeking a General Plan amendment, as the appellant is here. Accordingly, we affirm in part, reverse in part and remand with directions set out below.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant proposed the Project in 2015, several years after County updated its General Plan and adopted the Community Plan. County's General Plan, which we overviewed in *Golden Door* (*supra*, 50 Cal.App.5th at p. 488), was updated in 2011 to guide growth within "villages" in "compact land development patterns to minimize intrusion into agricultural lands and open spaces," prohibit leapfrog development, preserve the character of rural and semi-rural communities, and use an environmentally sustainable approach to planning, including development techniques to reduce greenhouse gas (or GHG, as used in the EIR) emissions. Both Elfin Forest and Harmony Grove are rural communities in very high wildland fire threat areas. Both communities seek to preserve and maintain their rural character by their Community Plan. In part, Elfin Forest does this by requiring all development to be served only by septic systems for sewage management. For Harmony Grove Village, the plan "strongly discourage[s]" development outside the village of commercial or industrial uses inconsistent with the community character.

The Project is situated on 111 acres of presently undeveloped land south of and contiguous to the existing Harmony Grove Village. It is within the Elfin Forest and Harmony Grove Planning Area of the San Dieguito Community Planning Area, whose existing land use designations are semi-rural residential and rural lands. Public access for existing and future

4

residents is solely via Country Club Drive (a north-south connector abutting the Project's western boundary). The Project proposes development of 453 residences, 5,000 square feet of retail/commercial space, approximately 35 acres of biological open space, about 9 acres of public and private parks, and 36 acres for common area open space, manufactured slopes and landscaping. The Project includes a range of lot sizes from 1,462 square feet to 4.85 acres, with single family homes ranging from 1,500 to 3,000 square feet and multi-family units ranging from 800 to 2,000 square feet. To allow such development, appellant proposed that County approve rezoning to change certain land use designations, a General Plan amendment, and a Community Plan amendment to add the Project as a component of the existing Harmony Grove Village plan area, and extend the boundary line of the village.[3]

A draft EIR, prepared for County as the lead agency, circulated for public review in mid-2017. It stated the Project would have a significant and unmitigated impact on air quality, explaining it proposed an increase in housing beyond what the County's Regional Air Quality Strategy (RAQS) included for the site, which would be "cured upon [County's] transmittal . . . of revised housing forecasts and action by the San Diego Air Pollution Control District." It identified other significant impacts that would be mitigated to a

---

[3] Specifically, the zoning for the Project area would change from Limited Agricultural and Rural Residential to a Specific Plan that would allow for residential, limited retail/commercial, utilities/institutional and open space/recreational uses. The General Plan would be amended to redesignate a portion of the property from Semi-Rural Regional to Village Regional and change the land use designation from Semi-Rural Residential to Village Residential and Neighborhood Commercial. The Community Plan amendment would add Harmony Grove Village South as an "independent but compatible component" of the Harmony Grove Village Specific Plan area, revise portions of the Community Plan text for General Plan conformance, and adjust the Village boundary line.

less-than-significant level.  Among other things, the draft EIR included a section on greenhouse gas emissions and a Greenhouse Gas Analyses Report.  It stated the Project would be consistent with local and State plans and policies to reduce GHG emissions, and thus impacts from such emissions would not be significant.  As for wildland fire hazards, the draft EIR explained that after the 2003 wildfires, County had included fire prevention strategies into its CEQA review process, including requiring a Fire Protection Plan (fire plan) for wildland urban interface areas.  It outlined numerous fire protective features of the Project (discussed more fully below), which included incorporating philosophies and physical attributes of "shelter in place" communities such as ignition-resistant structures built to latest codes, defensible landscape, available water supply throughout, and last-resort temporary refuge if early and safe evacuation was not possible.  The draft EIR concluded that impacts associated with wildland fire hazards would be less than significant; the Project would not expose people or structures to a significant risk of loss, injury or death from wildland fire given the numerous design features, the presence of a planned nearby fire station 1.3 miles from any structure on the Project site, and its compliance with fire codes and the fire plan, which had been accepted by the San Diego County fire authority.

Public comments on the draft EIR complained about its analysis of the Project's air quality impacts and contribution to climate change, and treatment of greenhouse gas emissions.  Other comments focused on the Project's consistency with County's General Plan as well as its compliance with County standards for protection against wildfire threats, including secondary egress requirements and the draft EIR's analysis of fire hazards, mitigation measures, and evacuation risk.  Respondent Elfin Forest Harmony Grove Town Council (Town Council) specifically challenged the draft EIR's

fire hazard conclusions as in conflict with General Plan policies and Fire Code provisions guarding against fire hazards, including secondary egress requirements, stating the Project would be both unlawful and also "would likely put lives and property in jeopardy." Town Council submitted a Wildfire Risk & Mitigation Analysis Report by Dr. Matthew Rahn (the Rahn report). Dr. Rahn asserted the draft EIR failed to adequately describe the modern risk of wildfires in the area or assess all known ignitions; that "[m]odern catastrophic wildfires are significantly different from the historic fire regime" in that "[c]urrently, only a fraction of the wildfires . . . in California are caused by natural events, with nearly ninety-five percent started by human activities." Dr. Rahn asserted the Project did not comply with standards related to emergency access, and the draft EIR provided no evidence that during an emergency the measures would provide the same or higher level of community protection and safety. He criticized the draft EIR's evacuation plan, community design and shelter-in-place measures as not providing adequate protection and assurance that the community could safely respond to severe wildfires. He also criticized the draft EIR and fire plan as based on improper modeling and not considering recent trends in the causes of wildfire

ignition, including the "potential for an increase in human-caused fire events" given the increased population.[4]

During the review period, this court invalidated the draft EIR's method (County's "Efficiency Metric") used to evaluate the potential impacts associated with the Project's greenhouse gas emissions. (*Golden Door Properties, LLC v. County of San Diego* (2018) 27 Cal.App.5th 892, 904-905.) Thus, County recirculated a draft EIR with revisions to the greenhouse gas emissions analyses, along with a supplement to the Greenhouse Gas Analyses Report. The supplement concluded that the Project would generate 4,411 metric tons of carbon dioxide ($MTCO_2e$) during construction and 5,222

---

[4] Dr. Rahn's 95 percent statistic is not accompanied by a supporting footnote or citation. He observed in part that future fires would likely not be exclusively wind driven. He wrote: "Given recent trends and possible changes due to a myriad of interrelated factors such as climate change, succession, and invasive species, there may be a concomitant increase in both human-caused fire events and lightning-caused wildfires. These scenarios are not addressed in the [draft EIR] or the Plan. For example, human-caused ignition events are predicted to increase with population. [Footnote omitted.] This is exacerbated by the prediction that there will also be an increase in the frequency of lightning as a result of climate change. [Footnote omitted.] This, of course, has direct implications for the risk of wildfires that we are already experiencing. [¶] In 2008, over 2,000 wildfires were started by over 6,000 dry-lightning strikes in Northern California. The record number of lightning strikes and extreme drought conditions created catastrophic conditions that burned nearly 1.2 million acres, destroyed over 500 structures, and killed 15 people. [Footnote omitted.] It is assumed that climate change is stimulating this change, and may bring lightning-caused fires to areas in quantities never seen in recorded history. [Footnote omitted.] Adding additional homes to an already burdened fire district adds the potential for an increase in human-caused fire events. It should be noted that this is not just in reference to arson. *Most wildfires today are the cause of* [*sic*] *human negligence or accidents from vehicles, heavy equipment, lawn care equipment, etc.*" The italicized sentence of Rahn's report contains no supporting footnote or citation.

MTCO$_2$e annually during operations after being fully built.[5]  Characterizing these as significant impacts, the draft EIR identified two mitigation measures—M-GHG-1 and M-GHG-2—by which the applicant, before issuance of the first grading permit and building permits for each implementing site plan, would purchase and retire greenhouse gas credits to reduce greenhouse gas emissions to net zero.  The purchased credits, according to the revised draft EIR, "shall achieve real, permanent, quantifiable, verifiable, and enforceable reductions."  Through mitigation, the draft EIR and supplement concluded the Project's construction and operation-related greenhouse gas emissions would result in a less-than-significant contribution to cumulative greenhouse gas impacts, and the Project would not result in a significant impact to global climate change.

The Project's final EIR, issued in May 2018, incorporated the draft's greenhouse gas and fire mitigation measures and reached the same conclusions.  It included a May 2018 final fire plan whose preparers included fire protection planners and a California licensed forester, as well as a Wildland Fire Evacuation Plan (evacuation plan) for the Project commissioned by the Rancho Santa Fe Fire Protection District.  The County

---

[5]     We explained in *Golden Door* that greenhouse gases (such as water vapor, carbon dioxide, methane, nitrous oxide, hydroflourocarbons, perflourocarbons, and sulfur hexafluoride, see *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 731) have varying heat retention capacity.  "Emissions of [greenhouse gases] are expressed as MTCO$_2$e, which is the amount of carbon dioxide in metric tons that would have the same global warming potential as the emission of the particular [greenhouse gas]." (*Golden Door*, *supra*, 50 Cal.App.5th at p. 484, fn. 3.)

Board of Supervisors approved the Project and certified the final EIR as in compliance with CEQA.[6]

Respondents thereafter filed their challenge. In a verified petition for writ of mandate and complaint for declaratory and injunctive relief, they alleged that in approving the Project, County violated state and local laws, including CEQA, as well as mandatory requirements in its General Plan limiting growth outside of designated villages, providing for affordable housing, and protecting residents from wildfire threats. They alleged the EIR failed to adequately address numerous impacts on air quality, greenhouse gases, wildfire, traffic, emergency access and land use. They alleged County's mitigation measures to reduce significant impacts were inadequate or ineffective.

Following a hearing on the matter, the superior court granted the petition and directed County to set aside its approval of the Project. Though it found the EIR adequately considered the cumulative effect of greenhouse gas emissions, it ruled the mitigation measures were unsupported: "[T]he [Planning and Development Services (PDS)] Director is allowed to approve any 'reputable' alternative agency. There is no standard by which the Director must evaluate a [carbon credit-issuing] registry's reputation. Moreover there is no assurance that the fact that the Director believes the

---

6 Because we directly review County's findings, we summarize them in connection with our discussion of each challenged portion of the EIR. Likewise, we later summarize some of respondents' public comments to the draft EIR or the claims made in their writ petition/complaint because it was respondents' burden below to establish inadequacy of the EIR, including to demonstrate there was insufficient evidence to support County's findings. (See *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 450; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275 (*Preserve Wild Santee*).)

10

chosen registry is reputable assures that that registry's credits are legitimate and the offsets will result in net zero [greenhouse gas] emissions." The court further found the EIR's analysis insufficient on the question of fire safety and evacuation times: the EIR did not address how adding new residents would affect the potential for wildfires to start, and there was no evidence that mitigation measures, including adding a new travel lane to Country Club Drive, would be effective in the event the sole evacuation route was blocked by fire. It found the EIR failed to actually analyze the Project's conflicts with the RAQS because its statistics about population growth were not included in the EIR and thus County failed to proceed in the manner required by CEQA. The court also found the Project did not contain an affordable housing component and County failed to show it was legally precluded from requiring developers to provide such a component; as a result it ruled the Project was inconsistent with County's General Plan policy H-1.9, which required an affordable housing component if requesting a General Plan amendment " 'when this is legally permissible.' " The court further found the Project fundamentally conflicted with a policy of the Community Plan that any development in Elfin Forest be served only by septic systems.

Several months after the superior court issued its ruling, this court decided *Golden Door, supra*, 50 Cal.App.5th 467, which involved County's third attempt to adopt a viable climate action plan (at times, CAP) and related CEQA documents for it. (*Id*. at p. 483.) The climate action plan was to serve as mitigation to reduce greenhouse gas emissions resulting from land development under County's 2011 General Plan update. (*Id*. at p. 490.) As we more fully explain below, the climate action plan's greenhouse gas emissions projections assumed the effective implementation of a carbon-offset mitigation measure—M-GHG-1—which we determined violated CEQA

11

because it contained unenforceable performance standards and improperly deferred and delegated mitigation. (*Id*. at pp. 482-483.) It is this mitigation measure to which the parties here compare the Project's greenhouse gas emission mitigation measures M-GHG-1 and M-GHG-2.

DISCUSSION

I. *General CEQA Principles and Standard of Review*

The California Supreme Court has explained the relevant underlying principles: " 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citations.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' [Citations.] The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.] 'Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' [Citation.] The EIR 'protects not only the environment but also informed self-government.' " (*Sierra Club, supra*, 6 Cal.5th at pp. 511-512, fn. omitted.)

In a CEQA case, as in other mandamus cases, our review "is the same as the trial court's: the appellate court reviews the [public] agency's action,

12

not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 427.) We assess the agency's determinations and findings under CEQA for abuse of discretion. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.) In *Sierra Club*, the court explained there is a "procedural issues/factual issues dichotomy. '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task is "not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club*, 6 Cal.5th at p. 512; see also *Golden Door*, *supra,* 50 Cal.App.5th at p. 512; *Preserve Wild Santee*, *supra*, 210 Cal.App.4th at p. 275.)

"[I]n reviewing an EIR for CEQA compliance, we adjust our 'scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.' [Citation.] For example, where a petitioner claims an agency failed to include required information in its environmental analysis, our task is to determine whether the agency failed to proceed in the manner prescribed by CEQA." (*Preserve Wild Santee*, *supra*, 210 Cal.App.4th at p. 275.) However, the analysis of "whether an agency has followed proper procedures is not always so clear. This is especially so when the issue is whether the EIR's discussion

13

of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' " (*Sierra Club*, 6 Cal.5th at pp. 512-513.) Such adequacy-of-discussion issues are not typically amenable to substantial evidence review. (*Id.* at p. 515.) What is clear is that in reviewing the adequacy of an EIR's discussion, a court does not "require technical perfection or scientific certainty: ' " '[T]he courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' " (*Ibid.*)

When faced with such claims, we are guided by three basic principles: "(1) An agency has considerable discretion to decide the manner of the discussion of potentially significant effects in an EIR. (2) However, a reviewing court must determine whether the discussion of a potentially significant effect is sufficient or insufficient, i.e., whether the EIR comports with its intended function of including ' " 'detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' [Citation.] (3) The determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions. [¶] The ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citations.] The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. [Citations.] Thus, to the extent a mixed question

14

requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Sierra Club, supra*, 6 Cal.5th at pp. 515-516; *Golden Door, supra*, 50 Cal.App.5th at p. 505.) Whether or not the alleged inadequacy is the complete omission of a required discussion or a patently inadequate one-paragraph discussion devoid of analysis, the reviewing court must decide whether the EIR serves its purpose as an informational document. (*Sierra Club*, at p. 516.)

When analyzing an agency's CEQA compliance, " 'there is no presumption that error is prejudicial.' (§ 21005, subd. (b).) 'Insubstantial or merely technical omissions are not grounds for relief. [Citation.] "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." ' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 942; see also *Sierra Club, supra*, 6 Cal.5th at p. 515 [" '[W]hen an agency fails to proceed [as CEQA requires], harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial' "]; *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463; *Golden Door, supra*, 50 Cal.App.5th at p. 505.)

## II. *Mitigation of Greenhouse Gas Emissions*

### A. *Project's Greenhouse Gas Mitigation Measures*

The final EIR provides that the Project's construction activities and operation at full buildout would generate greenhouse gas emissions that may have a significant impact on the environment. However, it concludes that

with mitigation, the impacts will be less than significant.  Specifically, it states that after analyzing feasible on-site measures to avoid greenhouse gas emissions, the Project applicant "has committed to reducing Project [greenhouse gas] emissions to 'net zero' through the purchase of additional off-site carbon credits.  The Project's commitment to achieve net zero emissions would be realized through the purchase and retirement of off-site carbon offsets.  This framework would ensure that the Project results in achieving carbon neutrality (i.e., no net [greenhouse gas] emissions.)"  The EIR acknowledges that the state Air Resources Board (CARB) recognized it may be appropriate to mitigate a project's emissions through this method with "credits issued by a recognized and reputable, accredited carbon registry when on site measures or regional investments are infeasible or non-effective."  Thus, in addition to project design features, the EIR requires the applicant to comply with mitigation measures to achieve carbon neutrality (i.e., no net greenhouse gas emissions through offset to zero).  Those measures are labelled M-GHG-1 (for construction activity emissions) and M-GHG-2 (for operational emissions).

M-GHG-1 and M-GHG-2 provide that before issuance of the first grading permit, and before issuance of building permits for each site plan, the Project applicant "shall provide evidence to the County [Planning and Development Services Department (PDS)]" that they have purchased and retired carbon credits in the amounts generated by construction and the Project's operation "pursuant to" or "consistent with" the following performance standards and requirements:

"a.  The carbon offsets that are purchased to reduce GHG emissions shall achieve real, permanent, quantifiable, verifiable, and enforceable

16

reductions as set forth in [Health & Safety Code section] 38562[, subdivision] (d)(1).

"b. One carbon offset credit shall mean the past reduction or sequestration of one metric ton of carbon dioxide equivalent that is 'not otherwise required' (CEQA Guidelines section 15126.4[, subd. (c)(3)]).

"c. Carbon offsets shall be purchased through a CARB-approved registry, such as the Climate Action Reserve, American Carbon Registry, or Verified Carbon Standard, or any registry approved by CARB to act as a registry under the State's cap-and-trade program. If no CARB-approved registry is in existence, then the Applicant or its designee shall purchase off-site carbon offset credits from any other reputable registry or entity, to the satisfaction of the Director of PDS.

"d. The County will consider, to the satisfaction of the Director of PDS, the following geographic priorities for GHG reduction features, and off-site carbon offset projects: (1) Project design features/on-site reduction measures; (2) off site within the unincorporated areas of the County of San Diego; (3) off site within the County of San Diego; (4) off site within the State of California; (5) off site within the United States; and (6) off site internationally."

For operational emissions, the EIR permits the Project applicant at its election to prepare an "Updated Operational Emissions Report" to present evidence that greater reductions of total emissions have occurred, allowing County to reduce the amount of credits required to be purchased at the next site plan approval phase "if the . . . Director . . . approves the Updated Operational Emissions Report and determines that the Applicant has demonstrated by substantial evidence that changes in State regulation or law, or other increased building efficiencies, have reduced the total MTCO$_2$e emitted by the Project and the reduction to the total carbon offsets, is

17

consistent with the Project commitment to achieve and maintain carbon neutrality (i.e., net zero emissions) for the 30-year life of the Project."

The EIR concludes: "Through this offset of all Project GHG emission (i.e., to net neutrality), through [M-GHG-1 and M-GHG-2], the Proposed Project would have less than significant GHG impacts. The mitigated Project would not generate GHG emissions that may have a significant impact on the environment because the mitigated Project would have no net increase in GHG emission, as compared to the existing environmental setting . . . . Because the mitigated Project would have no net increase in the GHG emissions level, the mitigated Project would not make a cumulatively considerable contribution to global GHG emissions."

Appellant contends the Project's mitigation measures for greenhouse gas emissions are unlike the M-GHG-1 mitigation measure for County's CAP that this court invalidated in *Golden Door, supra*, 50 Cal.App.5th 467. We turn to that opinion and review the invalid mitigation measure in that case.

B. *Golden Door*

In *Golden Door*, this court considered an EIR for County's climate action plan (actually a supplemental EIR or SEIR), which set out mitigation of greenhouse gas impacts from certain development projects *not consistent*

18

with County's plan.[7]  (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 494, 499.)
Under *Golden Door*'s mitigation measure M-GHG-1, a development project

[7]     County's climate action plan and its greenhouse gas reduction measures (unchallenged by the plaintiffs in *Golden Door* and different from the mitigation measure at issue in that case) applied to projects consistent with land use allowed under its 2011 General Plan.  (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 490, 493, fn. 14, 494, 500.)  But the plan's greenhouse gas projections did not include certain in-process and future development projects requiring a general plan amendment (with density or intensity beyond that allowed under the General Plan).  (*Id.* at pp. 494, 500.)  The SEIR for the plan concluded they could result in significant greenhouse gas impacts and may impact County's ability to meet its climate action plan targets.  (*Ibid.*)  Thus, the SEIR required those projects to use the measure invalided in *Golden Door*— M-GHG-1—to mitigate greenhouse gas emissions to within the threshold of significance, that is, not to exceed the climate action plan's greenhouse gas emission projections.  (*Ibid.*)

Respondents in this case have requested that we take judicial notice of the 2018 SEIR (section 2.7 related to greenhouse gas emissions in the supplement to the 2011 General Plan Update Program EIR) as an official act of a public entity (Evid. Code, § 452, subd. (b)) and also as a publicly available document that is capable of immediate and accurate determination (Evid. Code, § 452, subd. (h)).  In a supporting declaration, respondents' counsel does not say that the 2018 SEIR, or any of the other documents mentioned in the request (CAL FIRE summary reports of the 2018 and 2020 fire seasons and draft bills for the 2021-2022 legislative session) were before the superior court.  Appellant states they were not part of the administrative record.  We deny the request for judicial notice on that ground (see *Golden Door*, *supra*, 50 Cal.App.5th at p. 516 [denying request for judicial notice of document not within administrative record]; *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1192 [same]), and on the further ground respondents have not shown these items existed before County made its July 2018 decision approving the Project.  (See Guidelines, § 15162, subd. (c) ["Information appearing after an approval does not require reopening of that approval"]; *Manderson-Saleh v. Regents of University of California* (2021) 60 Cal.App.5th 674, 694-695 [exceptions allowing admission of extra-record evidence do not apply when the evidence is submitted merely to raise a question regarding the wisdom of an administrative agency's quasi-legislative decision such as a CEQA ruling].)

applicant could reduce all project greenhouse gas emissions with two options, the second being a "Net Zero" option. (*Id*. at p. 495.) This allowed the applicant to engage in offsite mitigation, including by purchasing carbon offset credits originating outside County or in another country, after incorporating feasible climate action plan reduction measures and onsite design features. (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 495, 500.) County's climate action plan's greenhouse gas projections excluded the inconsistent projects' emissions on the assumption that those projects would mitigate their greenhouse gas emissions to zero under M-GHG-1. (*Id*. at p. 500.)

The text of M-GHG-1 in *Golden Door* incorporated Health and Safety Code section 38562, subdivision (d) (section 38562(d)) by reference. (*Golden Door*, *supra*, 50 Cal.App.5th at p. 507.) That statute is part of the Global Warming Solutions Act of 2006 (also referred to as Assembly Bill No. 32) (*id*. at p. 488), which is implemented by CARB and directs CARB to adopt and design emissions regulations and reductions measures for greenhouse gases. (*Our Children's Earth Foundation v. State Air Resources Bd.* (2015) 234 Cal.App.4th 870, 873-874.) That Act authorizes CARB to include "market-based compliance mechanisms" such as greenhouse gas emissions exchanges or credits, one of which is the "cap-and-trade" program, to achieve the statewide greenhouse gas emissions limit. (*Id*. at pp. 875-876.) The Act "requires that every [CARB] regulation adopting [greenhouse gas] emission limits and emission measures 'shall ensure' that the [greenhouse gas] 'emission reductions achieved are real, permanent, quantifiable, verifiable, and enforceable by the state board.' " (*Id*. at p. 875, citing Health & Saf. Code, § 38562(d)(1).) Regulations must further include reductions " 'in addition to any greenhouse gas emission reduction otherwise required by law

20

or regulation, and any other greenhouse gas emission reduction that otherwise would occur.' " (*Ibid*., citing Health & Saf. Code, § 38562(d)(2) [referring to this as an " 'additionality' requirement"].)  These standards are further defined in title 17 of the California Code of Regulations.  (*Golden Door*, at pp. 506-507.)[8]

*Golden Door*'s measure M-GHG-1 stated in part:  "Carbon offset credits must be purchased through [certain named registries or through] . . . any other reputable registry or entity that issues carbon offsets consistent with . . . [Health and Safety code] section 38562(d)(1)." (*Golden Door*, *supra*, 50 Cal.App.5th at p. 507.)  It provided that County would consider "to the satisfaction of the Director of [PDS]" the following geographic priorities for greenhouse gas reduction features, projects and programs:  "1) project design

---

[8]    " ' "Real" means . . . that GHG reductions . . . result from a demonstrable action or set of actions, and are quantified using appropriate, accurate, and conservative methodologies that account for all GHG emissions sources, GHG sinks, and GHG reservoirs within the offset project boundary and account for uncertainty and the potential for activity-shifting leakage and market-shifting leakage.' [Citation.]  ' "Permanent" means . . . that GHG reductions . . . are not reversible, or when GHG reductions . . . may be reversible, that mechanisms are in place to replace any reversed GHG emission reductions . . . to ensure that all credited reductions endure for at least 100 years.' [Citation.]  ' "Quantifiable" means . . . the ability to accurately measure and calculate GHG reductions . . . relative to a project baseline in a reliable and replicable manner for all GHG emission sources . . . .' [Citation.]  ' "Verifiable" means that an Offset Project Data Report assertion is well documented and transparent such that it lends itself to an objective review by an accredited verification body.' [Citation.] ' "Additional" means . . . greenhouse gas emission reductions or removals that exceed any greenhouse gas reduction or removals otherwise required by law, regulation or legally binding mandate, and that exceed any greenhouse gas reductions or removals that would otherwise occur in a conservative business-as-usual scenario.' " (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 506-507, quoting Cal. Code Regs., tit. 17, § 95802.)

21

features/onsite reduction measures; 2) offsite within the unincorporated areas of the County . . . 3) offsite within the County . . . ; 4) offsite within the State of California; 5) offsite within the United States; and 6) offsite internationally." (*Id*. at p. 570.) Faced with the legal challenge to its plan, County in *Golden Door* argued the M-GHG-1 mitigation measure was effective and enforceable because it required offsets to be purchased from CARB-approved registries or registries that met Health and Safety Code section 38562(d)(1)'s requirements, substantially similar to cap-and trade offsets. (*Id*. at pp. 507, 510.)

In assessing that argument, this court first observed that "[t]he value of any offset depends on whether [greenhouse gas] emission reduction has occurred." (*Golden Door*, *supra*, 50 Cal.App.5th at p. 507.) We explained it is not possible to examine the greenhouse gas offset to determine its value because they are "invisible, [and] they actually *didn't happen*. So to have confidence in their value, we need a reliable and accurate picture of what *would have happened*, as well as what *actually happened*." (*Ibid*.) Thus, we explained, protocols are the procedures for accounting for credits to ensure they are an accurate and reliable representation of emission reductions that actually occurred; they " ' "qualify and quantify [greenhouse gas] destruction, ongoing [greenhouse gas] reductions or [greenhouse gas] removal enhancements achieved by an offset project." ' " (*Id*. at p. 508.) CARB had six of its own approved "Compliance Offset Protocols" that cap-and-trade offset projects were required to use. (*Id*. at pp. 508, 509.) CARB could invalidate offset credits if newly discovered information showed the protocol was noncompliant. (*Id*. at p. 510.) Further, for out-of-state and foreign country offset projects CARB had additional requirements—a "linkage" process—which required the Governor to make certain findings about the

22

program's strictness, California's ability to enforce it, the other jurisdiction's enforcement powers, and the absence of liability on California from the linkage. (*Ibid*.) CARB also approved and ensured qualifications of offset project registries, which list projects, collect and verify data, and issue offset credits. (*Ibid*.)

Given the County's arguments in *Golden Door*, we compared the M-GHG-1 measure to requirements of offset credits under the cap-and-trade model, which had to use the CARB-approved protocols to " 'ensure that the reductions are quantified accurately, represent real [greenhouse gas] emissions reduction, and are not double-counted within the system.' " (*Id*. at p. 508.) We held they were not equivalent:

"M-GHG-1 is materially different from Assem[bly] Bill No. 32 compliant cap-and-trade offsets in several key respects. Under M-GHG-1, offsets must be purchased through '(i) a CARB-approved registry, such as the Climate Action Reserve, the American Carbon Registry, and the Verified Carbon Standard, (ii) any registry approved by CARB to act as a registry under the state's cap-and-trade program, (iii) through the [California Air Pollution Control Officers Association Greenhouse Gas Reduction Exchange] and [San Diego Air Pollution Control District], or (iv) if no registry is in existence as identified . . . above, then any other reputable registry or entity that issues carbon offsets consistent with . . . [Health and Safety Code] section 38562(d)(1), to the satisfaction of the Director . . . .' At oral argument, the County explained that it is 'through the use of those registries that the protocol gets applied.' But M-GHG-1 says nothing about the protocols that the identified registries must implement. Therefore, implicit in the County's argument is that if the registry administering the offset is CARB-approved, then for that reason alone, *necessarily* the GHG emissions reduction protocol

23

administered by that agency is also Assem[bly] Bill No. 32 compliant, thereby ensuring the validity of the offset credit claimed. However, this assumption is incorrect." (*Golden Door*, *supra*, 50 Cal.App.5th at p. 511.)

We pointed out that under cap-and-trade, CARB had to approve both the registries *as well as* the protocols themselves, which also had to be from sources not already covered by cap-and-trade. (*Golden Door*, *supra*, 50 Cal.5th at pp. 511-512.) We criticized M-GHG-1 for not mentioning protocols or requiring any protocol to itself be consistent with regulations setting out Board requirements such as permanency. (*Id*. at p 512; see footnote 8, *ante*.) Nor did M-GHG-1 contain legislative safeguards to ensure out-of-state offsets reflected genuine greenhouse gas reductions. (*Id*. at p. 512.) The only limit on mitigating with international offsets was the Director's unilateral decision that offsets were not feasibly available within the unincorporated county, the County, California and the United States. (*Ibid*.) The unaddressed problem in M-GHG-1 was that County had no enforcement authority outside California, and the measure did not require a finding that an out-of-state offset had laws at least as strict as California's with respect to ensuring the offsets' validity. (*Id*. at pp. 512-513.) Accordingly, nothing but that feasibility determination restricted a project applicant from obtaining up to 100 percent of its greenhouse gas emission reductions through offsets, including international offsets, whereas the cap-and-trade offsets could not exceed eight percent of an entity's entire compliance obligation. (*Id*. at p. 513.)

M-GHG-1 had another significant deficiency (*Golden Door*, *supra*, 50 Cal.5th at pp. 514) in that it did not require the "critical" component of "additionality" to prevent greenhouse gases from continuing to increase; that requirement was contained in Health and Safety Code section 38562(d)(2)

24

(not section 38562(d)(1) referenced in the measure) and the measure was silent with regard to that subdivision.  (*Id*. at pp. 513-514, 515.)  Though the Director could approve offsets issued by any "reputable registry or entity that issues carbon offsets consistent with . . . [Health and Safety Code] section 38562(d)(1)," that subdivision did not require offsets to be additional.  (*Id*. at p. 514.)

This court further held that M-GHG-1 improperly delegated and deferred mitigation by allowing the Director to determine whether to approve offset credits on grounds (1) the registry or issuing entity is Board-approved or "reputable" and issues offsets "consistent with" Health and Safety Code section 38562(d)(1) and (2) the offset project is "not. . . 'available' or 'financially feasible' in a location closer to the County as listed in the geographical hierarchy."  (*Golden Door*, *supra*, 50 Cal.5th at p. 518.)  We saw this as providing "only a generalized goal of no increase or net zero [greenhouse gas] emissions, and then allow[ing] the Director to determine whether any particular offset program is acceptable based on unidentified and subjective criteria."  (*Id*. at p. 518.)  "M-GHG-1 contains no objective standards for determining whether any particular offset project is 'available' and 'financially feasible' in one location or another.  Without any objective and measurable standard for what 'feasible' onsite reductions consist of, M-GHG-1 provides no reasonable assurance that any onsite [greenhouse gas] reduction will actually occur."  (*Id*. at p. 520.)

We observed that offset projects in foreign countries presented additional concerns, because such offsets were not within CARB's jurisdiction and they were "inevitably dependent upon the host country or third parties to validate the activities giving rise to the offset" and posed the problem of corruption in the various stages of offset development, which would

undermine the offset.  (*Golden Door*, *supra*, 50 Cal.App.5th at p. 510.)  Thus, we found it "especially troubling" that "M-GHG-1 contains no objective standards for the Director to apply in determining whether offsets originating in foreign countries are real, permanent, verifiable, enforceable, and additional."  (*Id*. at p. 521.)

M-GHG-1 also deferred mitigation by entrusting to the "satisfaction of the Director" whether the proposed registry was "reputable" and the protocol being implemented by it was "consistent" with the criteria (real, permanent, verifiable, etc.) set out in Health and Safety Code section 38562(d)(1), without objective criteria for making such findings.  (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 521-522.)  The absence of performance standards was like the invalid mitigation measures in other cases having only generalized goals.  (*Id*. at p. 522.)  It was not "inherently unlawful" under CEQA to delegate the M-GHG-1 determinations to the Director, but the measure did not have objective criteria for exercising that discretion to ensure that the greenhouse gas emissions reduction goals were actually met.  (*Id*. at p. 523.)

Our conclusions compelled us to invalidate the County's climate action plan, which made greenhouse gas projections that excluded forecasted emissions from future and in-process projects requiring a general plan amendment on the assumption that M-GHG-1 would mitigate emissions above the plan to zero.  "Because M-GHG-1 is invalid, there is no factual basis for that assumption.  Accordingly, to this extent the [climate action plan's] finding that in-process and future [general plan amendments] would not result in significant [greenhouse gas] impacts is not supported by substantial evidence."  (*Golden Door*, *supra*, 50 Cal.5th at p. 525.)

26

C. *Analysis*

Appellant contends that here, the Project's M-GHG-1 and M-GHG-2 are materially different from *Golden Door*'s M-GHG-1 because they do not depend on or tier from County's climate action plan, and they contain the performance measures that were lacking in *Golden Door, supra,* 50 Cal.App.5th 467. It claims that the objective performance standards missing in *Golden Door* are established by the Project's requirements that offsets "shall achieve real, permanent, quantifiable, verifiable, and enforceable reductions as set forth in [Health and Safety Code section] 38562(d)(1)"; that one carbon offset credit is the past reduction or sequestration of one metric ton of "not otherwise required" carbon dioxide equivalent; and that offsets "shall be purchased through a CARB-approved registry, such as the Climate Action Reserve, American Carbon Registry, or Verified Carbon Standard, or any registry approved by CARB to act as a registry under the State's cap-and-trade program" or absent such a registry then from "any other reputable registry or entity, to the satisfaction of the Director of PDS." According to appellant, the invalid mitigation measure in *Golden Door* "had only a soft goal without any contextual definition" but the Project's credits here, including those from foreign countries or from a "reputable" registry, must satisfy the above performance standards and also be affirmed by an independent, qualified third party. Appellant argues the registries must have " 'adopted rules and procedures governing the retirement or cancellation of offsets.' " It quotes extensively from the EIR to support its assertion that substantial evidence supports the greenhouse gas mitigation measures for the Project.

As we previously acknowledged in *Golden Door*: "The value of *any offset* depends on whether [greenhouse gas] emission reduction has occurred."

27

(*Golden Door*, *supra*, 50 Cal.App.5th at p. 507, italics added.) Adequate mitigation requires that greenhouse gas emission reduction will actually be obtained, which is determined by valid protocols having objective criteria[9] for the Director to exercise his or her discretion to ensure that greenhouse gas emissions reduction goals are actually met. (*Id*. at pp. 507-508, 522, fn. 32, 523.) Such protocols would be compliant with Assembly Bill No. 32 (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 522, fn. 32) and would ensure offsets meet Global Warming Solutions Act requirements that they be real, additional, quantifiable, permanent, verifiable, and enforceable. (Health & Saf. Code, § 38562.) This is in keeping with CEQA, which requires adequate greenhouse gas emissions mitigation (including off-site, not-otherwise-required offset measures) to be enforceable, feasible, "supported by substantial evidence and subject to monitoring or reporting . . . ." (§ 21081.6, subd. (b); Cal. Code Regs., tit. 14, § 15126.4, subds. (a)(2), (c).)

However, like *Golden Door*'s M-GHG-1, the Project's mitigation measures do not mention protocols. (*Golden Door*, *supra*, 50 Cal.App.5th at p. 512.) As the invalid *Golden Door* measure did, the Project's M-GHG-1 and M-GHG-2 self-impose the requirements of Assembly Bill No. 32 by incorporating Health and Safety Code section 38562(d)(1) by reference. (*Golden Door*, at p. 507, fn. 21.) Thus, like appellant here, County in *Golden Door* argued the mitigation measure was valid ("effective and enforceable") because it required purchase of offsets that met those Health and Safety

---

9    In *Golden Door*, we described some criteria that could be used to ensure real reductions in various scenarios (recycling, forestry). (*Golden Door*, *supra*, 50 Cal.App.5th at p. 522 [requiring direct greenhouse gas reduction at a recycling facility or sequestering carbon for 100 years to ensure permanency].)

Code section 38562(d)(1) requirements (real, permanent, quantifiable, verifiable, and enforceable) from registries. (*Id.* at p. 507.)

We agree with respondents that the EIR's incorporation of the regulatory definitions for those requirements in the responses to comments does not by itself satisfy CEQA. The question is not whether these standards are particularly defined, but whether there are formalized accounting procedures in place to ensure credits meet them so as to represent real emission reduction. (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 507, 522, fn. 32.) This conclusion applies to M-GHG-1 and M-GHG-2's provision defining "[o]ne carbon offset credit" as "the past reduction or sequestration of one metric ton of carbon dioxide equivalent that is 'not otherwise required.'" While M-GHG-1 and M-GHG-2 state the offsets "shall" achieve the standards of Health and Safety Code section 38562(d)(1), the absence of protocols to ensure the standards are met is a fatal deficiency. This is not a requirement confined to cap-and-trade, but applies to any market-based compliance mechanism under the Global Warming Solutions Act of 2006.[10]

Though M-GHG-1 and M-GHG-2 are not identical to *Golden Door*'s M-GHG-1, other common deficiencies in the measures compel us to reach the same conclusion as in that case. Like the invalid *Golden Door* measure (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 570-571), the mitigation measures here give the applicant the option of using a "reputable registry or entity" if no CARB-approved registry exists. They "entrust[] to the 'satisfaction of the

---

[10] CARB-approved protocols are built into the Global Warming Solutions Act, which defines a market based compliance mechanism to include "greenhouse gas emissions exchanges [or] credits . . . governed by rules and *protocols established by the state board*," i.e., CARB. (See Health & Saf. Code, § 38505, subd. (k)(2), italics added; *Our Children's Earth Foundation v. State Air Resources Board*, *supra*, 234 Cal.App.4th at pp. 877-878.)

Director' whether the proposed offset registry is 'reputable' . . . ." (*Id.* at p. 521.) But like *Golden Door*'s invalidated measure, the Project's measures have no objective criteria for making such findings. Rather than include specific performance standards, they are "based on the Director's private and subjective discretionary determinations." (*Golden Door*, at pp. 524, 525.)

Further, the Project's M-GHG-1 and M-GHG-2 measures like M-GHG-1 in *Golden Door* contain no restrictions on mitigating with offsets originating in foreign countries, which present challenges with records and unreliable or illegitimate technology. (*Golden Door*, *supra*, 50 Cal.App.5th at p. 513.) In those situations, it " 'can be difficult if not impossible' to verify [greenhouse gas] reductions" (*ibid*) but M-GHG-1 and M-GHG-2 contain "no objective standards for the Director to apply in determining whether offsets originating in foreign countries are real, permanent, verifiable, enforceable, and additional." (*Id.* at p. 521.)

In global responses to public comments on the EIR, County explained that the Project requires use of Board-approved registries, each of which "develops its own protocols for estimating emission reductions or adopts parts of or full protocols from other registries." County pointed out that in 2011 the Board formally adopted its own protocols, and has since expanded its program to accept carbon offsets issued under the American Carbon Registry, and Verified Carbon Standard methodologies. But we explained in *Golden Door* that having a Board-approved registry is not enough, and voluntary registry protocols themselves must be approved by the Board and determined to be compliant with Assembly Bill No. 32. (*Golden Door, supra*, 50 Cal.App.5th at pp. 512, 513 [rejecting County's argument that registries would be the enforcement mechanism to ensure validity of offsets in foreign

30

countries because the mitigation measure "does not require use of an Assem[bly] Bill No. 32 compliant protocol"].)

An improper deferral issue is presented by the fact that the Director is allowed to decide whether to approve offset credits on grounds a non-Board-approved registry is "reputable" to the Director's "satisfaction." As we held in *Golden Door*, such language "allow[s] the Director to determine whether any particular offset program is acceptable based on unidentified and subjective criteria." (*Golden Door*, *supra*, 50 Cal.App.5th at p. 518.) It also means that achieving the goals set out in M-GHG-1 and M-GHG-2 "depends on implementing unspecified and undefined protocols, occurring in unspecified locations (including foreign countries), the specifics of which are deferred to those meeting one person's subjective satisfaction." (*Id*. at p. 520.) This sort of improper deferral causes these measures to violate CEQA. (*Ibid*.; see *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 525 [rule against deferral essentially prohibits " 'loose or open-ended performance criteria' " that afford a potential means of avoiding mitigation during project implementation, making it " 'unreasonable to conclude that implementing the measures *will* reduce impacts to less than significant levels' "].)

We are not persuaded by appellant's arguments as to the validity of the measures. It asserts that the Project's measures do not depend on County's climate action plan or on that plan's M-GHG-1. But the Project EIR here explained its greenhouse gas analysis was consistent with that plan and that its goal of "net zero" emissions effects was "in accord with the . . . M-GHG-1" that this court invalidated in *Golden Door*. The Project's Greenhouse Gas Analyses Report (Appendix J) likewise represents that the Project's M-GHG-1 and M-GHG-2 mitigation measures "require the Project to purchase and retire carbon offsets in a quantity sufficient to achieve net zero emissions, *in*

31

*accordance with* [*M-*]*GHG-1 from the County's Supplemental EIR . . . for its* [*climate action plan*]." (Italics added.) Consistent with that comparison, we see little difference between the Project's M-GHG-1 and M-GHG-2 mitigation measures and *Golden Door*'s M-GHG-1.

Appellant further points out the Project is not aiming to implement cap-and-trade, and CEQA does not require that greenhouse gas mitigation satisfy cap-and-trade requirements. But CEQA-compliant greenhouse gas emission mitigation using future determinations of the validity of offset credits must nevertheless have objective standards, not "unidentified and subjective criteria." (*Golden Door*, *supra*, 50 Cal.App.5th at p. 520.) In *Golden Door*, we reviewed CEQA-compliant mitigation measures at issue in other cases that were found to have sufficient standards, and contrasted them with absence of such criteria for the Director's exercise of discretion in M-GHG-1. (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 522-523.) As we concluded for M-GHG-1 in *Golden Door*, the failings in the mitigation measures for the Project at issue here render them non-CEQA compliant not just because they do not meet the sort of standards present in the cap-and-trade model, but because they lack objective criteria for the Director's future exercise of discretion.

Appellant also argues the measures are valid because the EIR requires that credits and emissions reductions be confirmed by independent, qualified third parties, and that registries have adopted protocols, rules and procedures governing the retirement or cancellation of offsets. This portion of County's responses to comments discusses CARB approved registries. There is no indication or assurance such standards will apply to an unidentified registry that is later determined by the Director to be "reputable."

32

*Golden Door* explains that mitigating conditions are " ' "not mere expressions of hope" ' " but must be enforceable through some legally binding instrument or agreement so as to result in real, permanent reductions. (*Golden Door*, *supra*, 50 Cal.App.5th at p. 506.) The deficiencies in M-GHG-1 and M-GHG-2 prevent them from meeting this standard. We acknowledge that this court limited *Golden Door*'s holdings to the facts of that case, and particularly to mitigation measure M-GHG-1. (*Golden Door*, at p. 483.) But the similarities between M-GHG-1 there and the mitigation measures for the Project in this case compel us to reach the same conclusion. M-GHG-1 and M-GHG-2 provide no reasonable assurance that greenhouse gas reduction will actually occur, and they are thus invalid under CEQA.

### III. *Impacts Related to Fire Safety*

The final EIR acknowledges that the Project lies within an area statutorily designated as a "Very High Fire Hazard Severity Zone." It also lies within a "Wildland Urban Interface," which is an area where development is proximate to open space or lands with native vegetation and habitat prone to brush fires. Thus, the EIR stated, improper design and maintenance may facilitate the movement of fire between structures and vegetation. Fire agencies recorded numerous fires in the Project site's direct vicinity. The fire plan evaluated fire behavior modeling, analyzed emergency services and response as well as fire access/evacuation, and cumulative impacts. Its purpose was to assess the potential impacts resulting from wildland fire hazards and identify the measures necessary to adequately mitigate those impacts. Additionally, the San Diego County Fire Authority's Fire Marshal commissioned a Wildfire Risk Analysis by fire and emergency management consultant Rohde & Associates, which included assessment of the site, fire history, water supply infrastructure, and potential evacuation

33

routes.[11] That analysis identified the likely paths of wildfire approach to the Project as well as recommended routes for escape, analyzing whether escape could be compromised by fire movement along those routes. The Rancho Santa Fe Fire Protection District's evacuation plan discusses available evacuation routes and their wildfire exposure, potential contingency refuge areas along evacuation routes, and other contingencies in case of certain circumstances, including when "[f]ire[] . . . prevent[s] safe passage along planned evacuation routes . . . ."

The fire plan explained that it was required to provide mitigation for identified impacts to "ensure that development projects do not unnecessarily expose people or structures to a significant loss, injury or death involving wildland fires." It "considered the fire risk presented by the site, including: property location and topography, geology (soils and slopes), combustible vegetation (fuel types), climatic conditions, fire history, and the proposed land use and configuration." It recommended "enhanced fire protection

---

[11]  Respondents do not challenge the qualifications of these consultants. The Wildfire Risk Analysis states that they had "[five] staff members with over 180 years of collective wildfire experience in Southern California, including highly decorated and experienced wildfire commanders and a nationally recognized fire behavior analyst." At County's request, Rohde and Associates analyzed not only evacuation routes, but also the fire fuels adjacent to the site, the site's fire history, the worst case weather conditions (including effects of climate change), the likely paths of wildfire, the expected fire exposure on the development's perimeter, the potential for spotting/fire branding (from lofted burning wood or other material) into the Project from nearby wildfire, whether there was a potential for a shelter-in-place mandate, whether there was a potential for civilian entrapment due to wildfire within the Project, the recommended sizing of safety zones and resource allocations for structural defense within the Project, and whether the community water supply adequately addressed fire flow demands from the Project during wildfire. It specifically asked whether "civilian's escape [can] be compromised by fire movement along these [evacuation] routes."

34

measures that the Homeowner's Association . . . and individual property owners will take to reduce the probability of structural ignition throughout the project." It also assessed whether the Project would result in inadequate emergency access. The fire plan stated the Project would include a layered fire protection system designed to current codes with "site specific measures that will result in a Project that is less susceptible to wildfire than surrounding landscapes and that would facilitate firefighter and medical aid response as well as project resident evacuation in a wildfire emergency."[12] But the Project required an exception to the County Fire Code regarding maximum dead end road lengths; given the smaller rezoned parcel size, the allowed maximum dead-end road length was 800 feet, but the dead-end road leading to the most distant structure measured 1.3 miles to intersection of

---

[12] These measures or "project design features" include clustering the footprint of homes to minimize their placement adjacent to wildland fuels; using lower flammability ignition resistant landscape, construction materials and structures; improving road access to existing homes east of the Project, which would improve those homes' evacuation situation; widening Country Club Drive to have a third travel lane and keeping no structure farther than 800 feet from that lane; providing three access ways off Country Club Drive as a looped interior road system to allow access to the northern roadway if one or both southern roads were blocked; replanting the internal Project development area with fire-resistant plants, excluding native fuels within the Project area and minimizing the likelihood of ignitions internal to the Project; placing fire hydrants every 300 feet along Project streets, exceeding the 350-foot fire code requirement; lighted entry maps and custom internal signage to facilitate navigation; fire department-compliant radiuses and turnarounds for roadways; 24 to 30-foot wide private streets; eliminating gates at the Project entrance, as well as speed bumps or humps, to enable traffic to flow more rapidly in case of emergency; and inclusion of 434 guest parking spaces, seven times more than the zoning code required so as to maintain Project roads unobstructed for emergency response vehicles. Property owners would be required to comply with provisions of the fire plan through homeowner association codes, covenants and restrictions.

Harmony Grove and Country Club Drive, the first opportunity to travel in at least two separate directions. Because the EIR determined that secondary access was infeasible, it concluded the Project's use of the site specific measures and features constituted an alternate approach for secondary access that "meets the intent of the [fire] code . . . ."

The EIR stated that the "layered and redundant fire protection and evacuation system . . . provide[s] a system of fire safety above and beyond the code requirements." It characterized the measures as "an alternative approach" that supported a finding by the Rancho Santa Fe Fire Protection District that the "intent of the code has been met and [the Project] does not lessen health, life and fire safety requirements." The EIR stated that the Project would not expose people or structures to a significant risk of loss, injury or death from wildland fires, and that with the addition of a planned fire station reducing travel time to all Project lots to under three minutes, the Project would more than comply with emergency response objectives. The EIR concluded that the impacts associated with wildland fire hazards, including cumulative impacts, would be less than significant. Both the San Diego County Fire Authority and the Rancho Santa Fe Fire Protection District accepted the fire plan.

In a supplemental letter submitted after release of the final EIR, respondent Town Council criticized County's evacuation analysis and the lack of secondary egress, asserting the EIR should have included additional data such as hourly vehicle carrying capacity of Country Club Drive, safe evacuation route use time window, and a maximum safe density limit for the entire existing and zoned potential population of humans and animals. Respondents' petition complained that the EIR did not adequately analyze the Project's potential to increase the fire risk in the area, and its analysis

36

"ignore[d] the local population increase the Project will bring." They relied on Dr. Rahn's 95 percent statistic, saying the EIR ignored the increased chance of fires from the additional human presence, and that the EIR's conclusion lacked substantial evidence because it did not consider the effect of increased population.

A. *Whether the EIR Adequately Addressed Project Wildfire-Related Impacts Is Subject to Independent Review*

As stated above, "whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question." (*Sierra Club*, *supra*, 6 Cal.5th at p. 514; *Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 739, 847.) "Where the ultimate inquiry is whether an EIR omits material necessary to reasoned decisionmaking and informed public participation, the inquiry is predominantly legal and, '[a]s such, it is generally subject to independent review.'" (*Chico Advocates*, at p. 847, citing *Sierra Club*, at p. 516.) The "predominately legal question" presented by such an argument is "whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'" (*Chico Advocates*, at p. 847.)

On this point, "Guidelines section 15126.2, subdivision (a) is instructive. It mandates that an EIR 'identify and focus on the significant environmental effects of the proposed project . . . examin[ing] [ ] changes in the existing physical conditions in the affected area,' that it identify and describe '[d]irect and indirect significant effects of the project on the environment,' and that the discussion should include, among other things, 'relevant specifics of . . . safety problems *caused by the physical changes*.'

37

(Guidelines, § 15126.2, subd. (a), italics added.) It also suggests that a connection be drawn between the two segments of information presented in the EIR—potential project [impacts] and human [safety] impacts. Such a connection would meet CEQA's requirements." (*Sierra Club*, *supra*, 6 Cal.5th at p. 520.) That section instructs that an EIR " 'shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected . . . . Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., . . . wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas.' " (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 388.) Thus, "[i]t is proper to evaluate 'a project's potentially significant *exacerbating* effects on existing environmental hazards—effects that arise because the project brings "development and people into the area affected." ' " (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 194.)

Also instructive is Appendix G of the Guidelines,[13] which suggests an agency should determine whether a project will "[e]xpose people or structures, either directly or indirectly, to a significant risk of loss, injury or death involving wildland fires." (Guidelines, Appen. G., § IX(g).)

---

13     " 'Guidelines Appendix G provides an environmental impact checklist form that lead agencies may use in preparing an initial study when deciding whether to adopt a negative declaration or prepare an EIR for a project.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 689, fn. 3, quoting 1 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2015) § 13.15, pp. 13-15.)

B. *Project's Impact on Wildfire Risk/Ignition*

Appellant contends that the EIR fully addressed fire safety. It points out the EIR was supported by the over 100-page-long fire plan, over 18 pages of responses to comments, and the Wildfire Safety Analysis, and asserts State (CAL FIRE) and County fire prevention officials who supported the Project merit deference. It asserts the Project would actually *reduce* fire risks in the area by improving local ingress and egress with additional travel lanes, separating the route from potential fuel, requiring "fire-hardening" of structures, requiring new and enhanced setbacks, providing a safe refuge at a community building, placing utility lines underground, adding guest parking to reduce roadway obstructions, and clustering its residential footprint to minimize the number of homes near wildland fuel. Appellant further contends the EIR anticipated the Project's occupancy and evaluated the potential increase in wildfires from the development and its occupants. It maintains the trial court's conclusion otherwise ("[t]here is no discussion . . . whether or how adding 1400 new residents into the area will affect the likelihood of wildfires") is based on an irrelevant and mischaracterized statistic: that "95 percent of modern wildfires in California are started by people."

Respondents' argument in their petition was that the EIR did not acknowledge the effect of adding human population to the area from the Project on the increased potential of wildfires starting. They pointed to Rahn's assertion that nearly 95 [percent] of wildfires are started by human activities and the EIR's acknowledgment that a typical wildfire may be caused by a tossed cigarette, car fire, or electrical power line arching, but stated the EIR "ignores the obvious implication that the increased human presence from the Project will increase the chances of such events." The trial

court agreed with these arguments, and ruled the EIR did not address how adding new residents would "affect the potential for wildfires to start."

On appeal, respondents repeat their assertions about the risks of fire ignition from additional residents, but add that the EIR's analysis assertedly did not address the risks to *existing residents*, nor did it assess "*all* the known ignitions and areas for high historic wildfire risk . . . ." They say "[t]he County should have had to explain precisely why bringing 1,400 additional people to a non-General Plan compliant development project in a Very High Fire Hazard Severity Zone outweighs the grave fire ignition risk to existing residents." They criticize the EIR for mentioning that the Project would introduce potential ignition sources and acknowledging typical human causes of fire in the vicinity, but not explaining, discussing or "undertak[ing] a thorough analysis of" those matters and the increased risk. According to respondents, it is not enough that Project features make homes there safer; the EIR was to analyze how the additional homes and people increase the fire danger, and without it, the public and decisionmakers had no way of knowing whether the mitigation measures would reduce the risk to a level of insignificance. They argue the Project features "do nothing to stop Project residents from engaging in activities in the surrounding areas that could increase wildfire ignition risk, such as driving a car or smoking." They argue there is no evidence in the record that the mitigation measures will "decrease human ignition risk."

We conclude the EIR contains a CEQA-compliant discussion of the potential wildland fire risks or exacerbation caused by the Project and the fire risks in the Project's vicinity, and that substantial evidence supports its conclusion that the Project measures would reduce them to a level of insignificance. The fire plan is incorporated into the EIR as an appendix and

40

thus was presented in a manner calculated to adequately inform the public of its conclusions. (*Stop Syar Expansion v. County of Napa, supra,* 63 Cal.App.5th at p. 460.) It refers to the applicable standard of significance, asking whether the Project would "expose people or structures to a significant risk of loss, injury or death involving wildland fires, including where wildlands are adjacent to urbanized areas or where residences are intermixed with wildlands." The EIR addresses the "wildland fire risk in the vicinity of the Project site," the Project's impact on the frequency of wildfires, and the Project's introduction of potential "ignition sources." The EIR quotes from the fire plan, stating: "Based on fire behavior modeling, the [fire plan] determined that wildfires may occur in wildland areas to the west, east, south, and southwest of the Project site, but *would not be significantly increased in frequency,* duration, or size *with the construction of the Project.*" It continues: "One reason is that the developing [Harmony Valley Grove] project has created a large lower risk area in alignment with north/northeast wind directions, reducing the fire threat at the Project site. In addition, various Project features would result in a site that is less susceptible to wildfire than surrounding landscapes and that would facilitate firefighter and medical aid response as well as Project resident evacuation in a wildfire emergency. The Project is providing code-exceeding measures . . . through a layered and redundant fire protection and evacuation system that would result in a highly defensible community, offer a means of equivalent egress, and provide contingency planning if evacuation from the site is considered unsafe." The EIR points out that among other things, utility lines would be placed underground, addressing at least one human-caused ignition source. While this appears in the EIR's land use section (1.2.2.2), it nevertheless is within the EIR, contrary to respondents' assertion otherwise. (See *San Diego*

41

*Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 12-13 [determination of CEQA compliance is based on review of the administrative record as a whole].)

The fire plan observes that currently existing potential ignition sources in the area include "vehicles, roadways, illegal recreation users, and off-site residential neighborhoods" and acknowledges that "the [P]roject would introduce potential ignition sources . . . ." However, it states the Project "would also include conversion of ignitable fuels to lower flammability landscape and include better access throughout the site, managed and maintained landscapes, [ ] and generally a reduction in the receptiveness of the area's landscape to ignition." The EIR and fire plan discuss in detail the features that reduce fire risk (see footnote 12, *ante*), explaining that the site-specific measures "will result in a Project that is less susceptible to wildfire than surrounding landscapes and that would facilitate firefighter and medical aid response as well as project resident evacuation in a wildfire emergency." The Wildfire Risk Analysis specifically acknowledges the existing residents in the area have no safety zones in the vicinity of their homes, but states they would use the same evacuation routes and safety zones for the Project, and likely "will view the proposed development site itself as an opportunity for safe refuge." The evacuation plan likewise discusses potential Project impacts on "existing resident evacuation" (some capitalization omitted), explaining that the Project ignition-resistant features would give fire officials and decision makers the option of allowing Project residents to shelter in their homes, and focusing evacuations on existing residents who are at higher risk, mitigating the impact on them.

Additionally, the evacuation plan explains that as part of Project approval, the Project's homeowners association will be bound to actively

42

participate as a partner with the Rancho Santa Fe Fire Protection District to assist with the coordination and distribution of fire safety information to residents. The association will provide homeowners with complete copies of the fire and evacuation plans, as well as a wildfire preparedness program ("Ready, Set, Go!") that focus on awareness for those living in the wildland-urban interface.

The EIR and supporting fire-related studies, in our view, account for and seek to mitigate new human-related triggers of fire ("ignition sources") brought in by the Project, which as a new residential development on previously undeveloped land inherently increases human population and activity in the area. County was entitled to accept the EIR's and fire officials' conclusions that the Project's impacts, including its addition of ignition sources, would not expose people or structures to a significant risk of loss, injury or death, over Dr. Rahn's differing conclusions and suggestions. " 'When the evidence on an issue conflicts, the decisionmaker is "permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others." ' " (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 349; *Chico Advocates for a Responsible Economy v. City of Chico*, *supra*, 40 Cal.App.5th at p. 851 [same].) Respondents' assertions about the significance of increased human-caused wildfire ignition risk amount to a disagreement between Dr. Rahn on the one hand, and the fire officials on the other, who are experts by virtue of their jobs and years of experience. (Accord, *Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413 [city planning department officers qualified as experts on cumulative environmental impacts analysis "since [it is] their business"].) A disagreement among experts is not a

sufficient basis to conclude an EIR is inadequate. (*Stop Syar Expansion v. County of Napa, supra*, 63 Cal.App.5th at p. 460.)

Our conclusion is bolstered by the fact that Dr. Rahn's 95 percent statistic is a bare assertion that does not support the proposition that increased human population significantly increases the wildfire risk. Dr. Rahn later cites a study for the proposition that "human-caused ignition events *are predicted* to increase with population." (Italics added.) County reasonably could reject the proposition that a nexus exits between population growth, which is a social change, and any significant consequence to the public health and safety, or the physical environment. (See *Chico Advocates for a Responsible Economy v. City of Chico, supra*, 40 Cal.App.5th at pp. 847-848 [CEQA requires social and economic changes to be addressed if they will cause changes in the physical environment].)

Further, we reject the assertion that the EIR should have evaluated "all the known" ignition sources. " ' "[A]n EIR need not include all information available on a subject" . . . [all that is required is] sufficient information and analysis to enable the public to discern the analytical route the agency traveled from evidence to action.' [Citation.] 'A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary.' [Citation.] 'Although others might well assess the significance of [a] risk . . . differently, it [is] error for the court to substitute its judgment for that of the Agency.' " (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 639-640; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 (*Laurel Heights*); *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th

44

200, 245 [CEQA does not require the lead agency to perform all recommended research to evaluate impacts of a proposed project; " 'The fact that additional studies might be helpful does not mean that they are required' "].) "[C]hallenges to the scope of an EIR's analysis, the methodology used, or the reliability or accuracy of the data underlying an analysis, must be rejected unless the agency's reasons for proceeding as it did are clearly inadequate or unsupported. [Citation.] The issue for us is ' "not whether the [fire plan, evacuation plan or Wildfire Risk Analysis] are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the [agency's] finding[s] . . . ." ' " (*Chico Advocates for a Responsible Economy v. City of Chico, supra*, 40 Cal.App.5th at p. 851.) They are here.

In sum, we do not decide who has the better argument on whether potential adverse impacts of the Project are mitigated or could be better mitigated; as "[w]e have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights, supra*, 47 Cal.3d at p. 393.) We conclude the EIR adequately addressed the fire risks posed to Project and existing residents by the Project's inherent injection of human activity, and that it included enough detail to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the Project. (*Sierra Club, supra*, 6 Cal.5th at p. 516.) We perceive no CEQA violation in County's conclusion that the Project, in view of its fire-protection features detailed in the EIR, would not exacerbate the wildfire threat beyond the threshold of significance and thus would not expose people or structures to a significant risk of loss, injury, or death from wildfires.

C.  *Analysis of Evacuation Response Times and Mitigation*

Multiple documents in the administrative record evaluate evacuation scenarios for the Project and surrounding area.  Both the EIR and fire plan address emergency access and evacuation routes.  The EIR acknowledges that the Project has only one code-compliant evacuation access road that would be improved to three 12-foot-wide travel lanes for the benefit of both Project occupants and several existing off-site residences, thereby providing additional capacity for emergency access into and out of the area.  The fire plan expands on the capacity:  "The project's traffic engineer states that each lane can effectively handle 1,900 vehicles per hour.  There are roughly 75 existing residential units that rely on Country Club Drive as their only means of ingress/egress.  With the maximum unit site plan for HGVS, an additional 453 residences would be added.  If a conservative estimate of three cars per household is used (the California average is roughly 2.7 vehicles— U.S. Census Bureau 2016), there would be a total of approximately 1,584 vehicles seeking egress, assuming worst case. . . . .  Conservatively assuming three vehicles per household are evacuating, [ ] with one lane, *all existing and proposed residences could evacuate within one hour* and still be approximately 316 vehicles below the capacity.  *The extra evacuation lane essentially doubles the capacity and provides a significant buffer of 2,216*

46

*vehicles per hour over what would otherwise be necessary*."  (Italics added.)[14]
Based on this supporting information, planning commission staff determined
that "all existing and proposed residences could evacuate within
approximately one hour."

Additionally, the EIR and fire plan address the availability of an
alternative evacuation route connecting to another road (Johnston Road) in
emergency situations "where people needed to be moved to the east and the
primary access route (Country Club Drive) was not available."  The Project
residents could not use the road for secondary access, but "the roadway would
be available for use to connect to Johns[t]on Road (a public roadway to the
east) . . . ."  The Wildfire Risk Analysis likewise evaluates potential
evacuation routes (Harmony Grove Road both east and westbound and
Harmony Grove Village Parkway to the north) and considered whether
"civilian's escape [could] be compromised by fire movement along these
routes."  It concludes there are four potential routes of escape, though
Harmony Grove Road was potentially dangerous and Harmony Grove Village
Parkway had "strong viability" as it "would only pose risk during extreme fire

---

14    The fire plan gave additional analysis on the effect of the new lane:  "It
is not uncommon for it to require up to 90 minutes elapsed time from the
time the decision is made to evacuate until all evacuees have left their
occupancy of origin. . . .  If only [one] lane was available for egress at [the
Project], it would be anticipated that the evacuation protocol (decision to
evacuate, notification to initiate Reverse 911, police respond, and completion
of Reverse 911), would take roughly 45 minutes and moving the worst case
1,828 vehicles out of the area would require just under one hour, for a total
time of [one hour 45 minutes].  This time can be reduced significantly with a
second lane, as proposed for this project.  The evacuation protocol time
remains constant at 45 minutes, but the movement of 1,828 vehicles on two
lanes cuts the nearly [one] hour to 30 minutes, for a savings of roughly 30
minutes for a complete evacuation when compared to the one lane scenario."

behavior, and should be acceptable during lesser fire events." The latter road was recommended by consultants and public safety staff evaluators as the alternate escape route. The Wildfire Risk Analysis reports that those evaluators "expressed comfort that the proposed fire code variance for the dead end access road was acceptable."

Both the fire plan and the Wildfire Risk Analysis further look to a "shelter-in-place" last resort option in the event of either high intensity wildfire threats to escape routes, the rapid onset of high intensity wildfire preventing escape opportunities, or "fires [that] originate in the Harmony Grove community." They describe availability in a community park, within interior tract streets inside the larger Harmony Grove community, and a 5,000 square-foot, 330 person-capacity community center stocked with emergency supplies.

The Wildland Fire Evacuation Plan clarifies the fire plan and Wildfire Risk Analysis. It was prepared based on the County's Operational Area Emergency Operations Plan, and found to be consistent with County and City evacuation planning standards. As indicated above, it considers a contingency option where evacuation routes are rendered unsafe, stating it may be advisable to direct evacuees to pre-planned temporary refuge locations, including their own homes if ignition-resistant and defensible, as were the homes in the Project. Both the San Marcos Station Commander and a CAL FIRE Unit Chief testified before the Board and agreed the Project's evacuation plan was sufficient, the CAL FIRE Unit Chief describing the addition of a third lane as a "game changer."[15]

---

15   The San Marcos Station Commander said: "I reviewed this particular plan and the other ones for what infrastructure they have, the ability to move them, how many people there are, and I'm confident we can evacuate these people given the situation. Now, people want to talk about what particular

Stating that the Project assumed residents would evacuate through Country Club Road, the single entrance to the site, respondents below complained that the EIR "ignore[d] the gross danger posed by the Project's evacuation scheme," and posited, "If the single exit is blocked by fire, residents will have no escape." They thus argued the evidence could not support a conclusion that the Project provided safe evacuation. Respondents asserted County "offers no explanation as to how the third lane will mitigate any harm to fleeing residents if the road is blocked by fire." They argued there was no evidence of the efficacy of the Project's shelter-in-place philosophy, which "offers nothing to current residents of the area who would be trapped in the same failed evacuation as Project residents." Respondents argued the Project "facially violat[ed] the Fire Code" and the record lacked

---

road we'll use, how will this happen, what about the existing people. I first have to see the situation to tell you what I would do, but I've done it before. My agency has done it many times, and I think we've gotten very good in this county of how to evacuate people. I like the three-lane bridge. Choke points bridges [*sic*] are generally a problem when moving people. Three lanes give you alternatives. . . . Having three [lanes] is a route game changer as far as two lanes out and one still to get in. And then if there's a problem in the roadway—a medical problem—something always happens—it still doesn't completely tie up traffic. So I've looked at it. I'm confident. I understand there are residents that disagree with me. But I've been doing this for going on 28 years and I've been involved in every major fire and we're able to get people out."

substantial evidence that it would provide equivalent protection. The trial court essentially agreed with these points.[16]

On appeal, respondents repeat these complaints, citing conclusions of expert Rahn that a best-case evacuation time would be one hour and thirty minutes, opinions of residents that it could take several hours, and asserting a fast-moving fire could "potentially block Country Club Drive and trap the entire community." They argue the relevant analysis is "whether the Project would increase evacuation times and, if so, how substantial would those increases be," but assert the EIR answers a different question and "summarily concludes" there will be sufficient egress in a fire emergency. They criticize County fire officials' conclusion that Project fire safety measures meet the intent of code requirements, arguing "whether a dead end road within the new subdivision should receive a Fire Code variance is unrelated to whether the Project would impact evacuation times for existing residents." They point to expert opinions that adding an additional lane to a single access road does not improve evacuation times, and argue the EIR is legally insufficient for failing to calculate evacuation times "to safe refuge

---

[16] The superior court found the Project did not comply with the Fire Code's requirement that dead end roads be no more than 800 feet long. It acknowledged the Project would widen Country Club Drive, but rejected County's conclusion that wildfire impacts were reduced to a level of insignificance by the Project's multi-layered fire protection and evacuation measures: "The fact that the Fire Marshall concluded that the alternative measures are consistent with the intent of the Fire Code is not the same as saying the Project will not have a significant impact on evacuation times. Moreover, the fire safety measures largely consist of features that are intended to reduce the spread of fire such as using fire-resistant buildings and plants and installing fire hydrants, which have no relation to improving evacuation times. There is no evidence that the mitigation measures, including adding an extra travel lane, will be effective in the event that the sole evacuation route is blocked by fire."

50

locations" beyond the Project by County's own emergency operations plan, i.e., the function of " 'the number of vehicles that need to evacuate [divided] by the total roadway capacity . . . .' " They also point to an e-mail from the Rancho Santa Fe Fire Chief reviewing the evacuation plan that if fire "bumps [Country Club Drive], the road will be unusable."

We conclude the EIR's discussion of evacuation routes and timing satisfies CEQA requirements. The EIR's purpose is informational; to inform decisionmakers and the public of the basis on which the Board decided to approve the Project involving significant environmental effects. (See *Laurel Heights*, *supra*, 47 Cal.3d at p. 391; *San Diego Citizenry Group v. County of San Diego*, *supra*, 219 Cal.App.4th at p. 21.) An EIR must "consider and resolve every fair argument that can be made about the possible significant environmental effects of a project." (*Protect Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109.) But where the agency determines a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion. (§ 21100, subd. (c) [EIR need only "contain a statement briefly indicating the reasons for determining that various effects on the environment of a project are not significant and consequently have not been discussed in detail in the environmental impact report"]; see Guidelines, § 15128; *Clover Valley Foundation v. City of Rocklin*, *supra*, 197 Cal.App.4th at p. 243, citing in part *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492-493.) The EIR must be sufficiently complete and a good faith effort at full disclosure, not technically perfect. (*Sierra Club*, *supra*, 6 Cal.5th at p. 522; Guidelines, § 15151.)

Here, the relevant analysis is whether the Project will expose people and structures to a significant risk of wildfire, including whether it will

51

exacerbate the wildfire risks in the area or cause safety problems. (Guidelines, § 15126.2; *Sierra Club*, *supra*, 6 Cal.5th at p. 520.) Certainly there is a potential for the Project to impact safety related to protecting Project and other existing residents in the very high fire area. But the accompanying studies are anything but summary with respect to evacuation scenarios and alternatives. They sufficiently state "the reasons for determining that [the effects of the Project on safety relating to fire risk] are not significant . . . ." (§ 21100.)

That respondents presented Rahn's or other experts' competing conclusions does not render the EIR inadequate. As we have pointed out, it is well established that " '[disagreement] among experts does not make an EIR inadequate.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 409; Guidelines, § 15151; see also *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1069 [the substantiality of evidence is not undermined by the parties' differing expert opinions].) And it is fundamental that this court's "review does not encompass ' "the correctness of the EIR's environmental conclusions, but only its sufficiency as an informative document. [Citation.] 'We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. "Our limited function is consistent with the principle that '[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " [Citation.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.' " ' " (*High Sierra Rural Alliance v. County of Plumas*

(2018) 29 Cal.App.5th 102, 121; see *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; *Laurel Heights*, *supra*, 47 Cal.3d at p. 409 [reviewing court " 'does *not* have the duty of passing on the validity of the conclusions expressed in the EIR, but only on the sufficiency of the report as an informative document' "].)

Respondents' arguments concerning the analysis of evacuation times are unavailing. The EIR engaged in a calculation of the evacuation time on Country Club Drive using the capacity of vehicles per hour, in keeping with the formula set out in County's Operational Area Emergency Operations Plan. Respondents complain that this calculation did not relate evacuation time *all the way to safety* or to safe refuge locations beyond the Harmony Grove Road intersection, but this challenges the methodology used and does not invalidate or render insufficient the analysis engaged in by the fire plan and the other studies. (*Chico Advocates for a Responsible Economy v. City of Chico*, *supra*, 40 Cal.App.5th at p. 851.) The evacuation plan stated that one of its objectives was to "[p]rovide for evacuation to appropriate transportation points, evacuation points, and shelters" and explains that the sheriff and incident commander coordinate with the responding fire agency to decide locations to use as temporary evacuation point which serve as safe zones for evacuees, listing such potential locations. We disagree that further quantification of evacuation time to these locations was needed. Again, the issue is whether the evacuation plan is sufficiently credible to be considered as part of the total evidence supporting County's the agency's decision. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 409; *Chico Advocates*, at p. 851; *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 372; see also *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1362 ["an expert can make a

judgment on existing evidence, without further study, that a particular condition will have no significant impact"].)  The matter relied upon by County for its findings includes " 'fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact,' which constitute substantial evidence to support [them]." (*Eureka Citizens*, at p. 373; § 21080, subd. (e).).)

Another premise of respondents' argument is that there is only a single evacuation route that will leave residents stranded if blocked by fire.  But the fire plan explains that another road out of the Project area is accessible to passenger vehicles.  While it is not code-conforming secondary access, it is nevertheless available in an emergency situation "that require[s] moving people to the east and the primary access route (County Club Drive) [is] not available."  Further, the EIR and its supporting wildfire-related studies do not ignore a scenario where evacuation routes become unusable.  The EIR and fire plan evaluate "the potential for impairment of a single road by vehicle congestion, condition of terrain, climatic conditions or other factors," explaining that the Project adopted an alternative approach to implement

fire protection and evacuation measures that meets fire code requirements.[17] Widening Country Club Drive was not the sole method to lessen the risks. The Project clusters residential development so as to minimize proximity of homes to wildland fuels and create a defensible perimeter, and the Project proposes a contingency plan for moving people to temporary refuge locations such as homes or the club house. We do not pass on the correctness of the EIR's conclusion that these and other fire protection measures detailed in the EIR exceed fire code requirements. To the extent respondents challenge those measures as inadequate or ineffective mitigation, we conclude the board was entitled to choose to believe the fire officials who signed off on them. (See *Laurel Heights*, *supra*, 47 Cal.3d at pp. 408-409.) The EIR's conclusion that Project fire safety measures reduce fire hazards to a level of insignificance is supported by substantial evidence, namely the fire-related expert studies. They are not so "clearly inadequate and unsupported" as to be entitled to no judicial deference. (*Id*. at p 409, fn. 12.)

---

[17] Because fire officials determined that compliance with the dead end road length requirements was impracticable, they granted a modification from the dead end road fire requirements contained in the San Diego County Consolidated Fire Code (at the time, § 503.1.3, now § 503.2.5.1) based on the fire-protection features of the Project. The fire plan explains: "When the strict application of the requirements set forth in [Consolidated Fire Code] Section 503.1.3 is impracticable, . . . the fire code official may grant a modification from such requirements. A modification may be granted when the modification is in compliance with the intent and purpose of the code and such modification does not lessen health, life, and fire safety requirements." (Citing Consolidated Fire Code, § 96.1.104.8 [relating to modifications].) The fire plan states "the [P]roject is providing code-exceeding measures in various aspects of fire protection and safety that, combined, result in a highly defensible community, offers a means of equivalent egress, as well as contingency planning if evacuation from the site is considered unsafe."

IV. *EIR's Analysis of Consistency with Air Quality and Land Use Planning Documents*

A. The *RAQS*

The RAQS outlines the San Diego Air Pollution Control District's plans and control measures designed to attain State air quality standards for ozone. It relies on growth projections used by SANDAG, and includes projections for residential, commercial, industrial and recreational land uses contained in County's General Plan. The Project proposes to increase the total number of dwelling units from the 220 units allowed under the General Plan to 453, causing the Project to exceed the dwelling units proposed in the RAQS. The EIR concluded that the inconsistency with the current RAQS caused a significant cumulative impact. The EIR nevertheless concludes that while the Project is not compliant with the RAQS and has a significant cumulative impact *in that respect*, it is in compliance with federal and state ambient air quality standards and would not result in significant air quality impacts with respect to the Project's construction and operational-related emissions of ozone precursors or criteria air pollutants, making it unlikely that the increased density would interfere with goals for improving air quality in the San Diego air basin.

In approving the Project, County acknowledged that the Project was not accounted for in the current RAQS, but found "County has not achieved buildout intensity levels assumed under the RAQS . . . , and this, in conjunction with the Project's less than significant emissions, is not expected to result in obstruction of the implementation with [*sic*] local air quality plans. The lack of inclusion of the Project in the RAQS . . . is identified as a significant conflict relative to plan non-conformance. The provision of housing information (M-AQ-1) would assist SANDAG in revising the housing

56

forecast and therefore assist [the Air Pollution Control District] in revising the RAQS . . . ; however, until the anticipated growth is included in the emission estimates of the RAQS . . . , the direct impacts would remain significant and unavoidable." It stated that the mitigation measure imposed on the Project as a condition of approval required County to "provide a revised housing forecast to SANDAG that results in revisions to the population and employment projections used by the [Air Pollution Control District] in updating the RAQS . . . , which will accurately reflect anticipated growth due to the Proposed Project."[18]

---

[18]    County's findings refer to both the RAQS and the State Implementation Plan (SIP), both of which " 'provide the region's documentation for improving air quality' " and are updated on a triennial basis. (*San Diego Navy Broadway Complex Coalition v. California Coastal Commission* (2019) 40 Cal.App.5th 563, 602.) County's supporting rationale for its finding explains: "Although the County has not achieved buildout intensity levels assumed under the RAQS and SIP, the conflict with the current RAQS and SIP resulting from the density proposed for the . . . Project being inconsistent with current General Plan and SANDAG housing forecasts is conservatively identified as representing a significant impact as a planning document conflict." It stated that the housing forecasts are provided by SANDAG to the Air Pollution Control District, which prepares the RAQS and Ozone Attainment Plan and provides those to the state Air Resources Board, and that "[t]hese are ongoing and routine programs that are beyond the purview of the County to manage and direct." The County stated that "[u]pon its inclusion and incorporation into regional modeling, this impact will be addressed." "Thus, future updates to the RAQS . . . would account for the Project's expected population. . . . Once a future update that is reflective of the Project's planned increase in intensity on site would occur, the Project would then be consistent with the RAQS. While identified as a significant plan consistency impact until an update is completed, the Project emissions of criteria pollutants do not exceed threshold criteria, and there would be no significant impact to human health or the environment from the Project's emissions."

57

In challenging the EIR on this point, respondents argued County should have described the increase in air pollutant emissions that would result from the Project's unplanned growth, and the EIR thus failed to inform the public and decisionmakers of the severity of the air quality impact. The trial court found fault with County's finding, ruling that the information on which it relied for its population growth conclusions (a staff report and an e-mail with statistical charts pertaining to San Diego's regional needs housing assessment) must have been explicitly incorporated into the EIR. It ruled the "EIR should have actually analyzed the conflicts with RAQS. By not doing so, the County failed to proceed in the manner required by CEQA."

Appellant contends the EIR properly evaluated the Project's impact on the RAQS, which establishes a population-based air quality strategy. It characterizes the EIR as finding a "paper impact, not a physical one" requiring only the eventual inclusion of the population information into the regional plan, an approach this court upheld in *San Diego Navy Broadway Complex Coalition v. California Coastal Commission* (2019) 40 Cal.App.5th 563 (*San Diego Navy*). In *San Diego Navy*, the proposed mitigation for a project's inconsistency with growth projections in a regional plan was for the regional air district to amend the plan. (*Id.* at pp. 602-603.)

Reviewing County's determination directly as we must (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 427), we hold the County did not err in its findings, and that its treatment of consistency with the RAQS (analyzed as a "planning document conflict") was adequate. We agree County's finding is akin to that of the Coastal Commission in *San Diego Navy*, *supra*, 40 Cal.App.5th 563 that a Port District master plan amendment would " 'ensure consistency with San Diego Air Pollution Control District's . . . requirements upon amendment of the Air District's growth projections to

58

reflect the increased growth anticipated in the Port Master Plan area.' " (*Id.* at p. 602.) In that case, the EIR described the role of the Air Pollution Control District and its RAQS, explaining that because the project there would result in greater density, it would be "inconsistent with the RAQS . . . until [it and the State Implementation Plan] were updated." (*Id.* at p. 603.) The "proposed mitigation required the Port and City to request that the Air [Pollution Control] District amend growth assumptions to incorporate the Project prior to the next triennial review." (*Ibid.*) "The Port's Coastal consistency analysis found that the Project would be inconsistent with the RAQS and SIP until they were revised in the next review." (*Ibid.*) In part based on the presumption that an agency carries out its official obligation absent contrary evidence (Evid. Code, § 664), we upheld the Commission's finding: "As reflected in the EIR and Port [District] analysis, there was a plan to ensure air quality consistent with the Air [Pollution Control] District's existing review obligations, notwithstanding questions about when it would occur. The [Coastal] Commission could reasonably find that the Air [Pollution Control] District *would* comply with its duties and account for Project impacts in its next review cycle, thus minimizing any substantial adverse environmental impact." (*San Diego Navy*, at p. 603.) We rejected the challenge that the Coastal Commission "approve[d] polluting development and uses just because another regulatory agency has jurisdiction over pollution," stating the Coastal Commission "neither allowed polluting development, nor let the Air [Pollution Control] District decide whether to do so. Rather, it determined that the Air [Pollution Control] District's review process would account for emissions increases from the Project." (*Ibid.*)

The same reasoning applies here, where the Project's inconsistency with the RAQS planning document—its addition of dwelling units beyond the

59

plan's projections—will be resolved when SANDAG updates its growth projections and provides them to the Air Pollution Control District, which will then prepare and update the RAQS and its modeling as it is required to do. (See *San Diego Navy*, *supra*, 40 Cal.App.5th at p. 603, fn. 31 [pointing out the law requires the Air Pollution Control District to regularly revise and update its plans].)

Respondents argue that the EIR was insufficient because it did not adequately analyze the Project's air quality impacts. They characterize the EIR as finding that the conflict with RAQS would result in significant air quality impacts. As to actual air quality impacts stemming from the Project, the argument is belied by the EIR, which analyzed the Project's construction, operational, and cumulative impacts on air quality under relevant guidelines for significance and determined them to be less than significant. Respondents did not challenge those air quality impact findings by a cross-appeal. The portion of the EIR cited by respondents for their proposition addresses the "[c]onformance to the RAQS" as a planning document, finds *that* lack of conformance or inconsistency to be a significant impact, and concludes it is unmitigated, explaining that the County "shall provide a revised housing forecast to SANDAG to ensure that any revisions to the population and employment projections used by the [San Diego Air Pollution Control District] in updating the RAQS and SIP will accurately reflect anticipated growth due to the . . . Project." An EIR must "discuss any inconsistencies between the proposed project and applicable . . . regional plans." (Guidelines, § 15125, subd. (d); *Golden Door*, *supra*, 50 Cal.App.5th at p. 540.) The EIR performed this function.

Respondents further argue the EIR failed to provide information about the nature and scope of the inconsistency beyond stating the increase in

60

dwelling units, or quantify the cumulative increase in air pollutant emissions from the Project. They say the EIR acknowledges "that more analysis was needed 'to determine if that Project and the surrounding projects exceeded the growth projections used in the RAQS for the specific subregional area.' " But this misreads the EIR; the cited paragraph makes a generic statement about the consequences of projects' proposed development and consistency with the RAQS, it is not a statement about the Project at hand, which it determined was inconsistent and unmitigated pending an update to the RAQS growth projections. As stated, the Guidelines state that an EIR shall discuss any inconsistencies between the proposed project and applicable regional plans. But CEQA and the Guidelines do not require an agency to make any particular finding with respect to the project's consistency or inconsistency with such plans. " 'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not . . . require an analysis to be exhaustive.' " (*Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145; see also *Sierra Club*, *supra*, 6 Cal.5th at p. 515.) We conclude the EIR adequately discussed the Project's inconsistency with the RAQS.

B. *San Diego Forward*

We discussed the San Diego Forward regional plan (at times referred to in the EIR as the Regional Plan or 2015 Regional Plan) and its background in *Golden Door*. (*Golden Door*, *supra*, 50 Cal.App.5th at pp. 533-537.) San Diego Forward resulted from the merging of earlier growth and transportation plans (the Regional Comprehensive Plan and the Regional Transportation Plan with its required Sustainable Communities Strategy, required by the Sustainable Communities and Climate Protection Act, Senate Bill No. 375). (See Gov. Code, § 65080, subd. (b)(2)(B); *Golden Door*, at p. 534; *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37

61

Cal.App.5th 698, 718-719 (*Sacramentans*).)  It does not regulate land use, however; its purpose is to provide direction and guidance on future regional growth and transportation patterns.  (*Golden Door*, *supra*, 50 Cal.5th at pp. 534-535 [Sustainable Communities Strategy establishes how land uses and transportation projects will achieve CARB's greenhouse gas reduction targets, including a forecasted development pattern for the region; it is not the equivalent of a general plan, and does not require local government to take particular actions in planning, regulating and permitting land development]; *Sacramentans*, at pp. 723, 724 [sustainable communities strategy "is 'a forecasted development pattern for the region' which, if implemented by [the designated planning organization], will reduce greenhouse gas emissions from automobiles and light trucks that would otherwise result from new development"].)  San Diego Forward serves as the "blueprint for how the San Diego region will grow and how SANDAG will invest in transportation infrastructure to provide more choices, strengthen the economy, promote a healthy environment, and support thriving communities."  It is intended to establish a planning framework to "increase the region's sustainability and encourage 'smart growth while preserving natural resources and limiting urban sprawl.' "  It is also intended to encourage County to increase residential and employment concentrations in areas with the best existing and future transit connections, and to preserve important open spaces.  Its principles are designed to "strengthen the integration of land use and transportation."[19]

---

[19]     More specifically, the EIR states:  "At the core of the [San Diego Forward] Regional Plan is a Sustainable Communities Strategy that charts a course towards lowering [greenhouse gas] emissions and includes the following five building blocks: [¶] • A land use pattern that accommodates our region's future employment and housing needs, and protects sensitive

The EIR discussed the Project's consistency with San Diego Forward both with respect to greenhouse gas emissions, which that plan seeks to reduce (see *Golden Door*, *supra*, 50 Cal.App.5th at p. 535; *Sacramentans*, *supra*, 37 Cal.App.5th at p. 723), and also with regard to land use impacts. As to the former, the EIR states in part that though the Project increased density of residential land uses, it included design features to reduce greenhouse gas emissions that support San Diego Forward's goals, including a photovoltaic solar system, electric vehicle charging stations, low-flow water features, and drought tolerant landscaping. It stated that "[w]hile the Project site was not identified for development in SANDAG's San Diego Forward 2020 . . . forecasted development pattern maps, the Project site location was identified for development consistent with the 2011 General Plan in the SANDAG 2035 forecast development pattern map, and is . . . in-line with the [Sustainable Communities Strategy greenhouse gas] benefits as the Project would support and/or provide a range of housing types, services and jobs in a compact pattern of development located within 0.5 mile (a 10-minute walk) of commercial and civic facilities, and is located near to transit stops and employment centers." According to the EIR, SANDAG's average trip length is 7.9 miles, and the average distance for Project trips was calculated to be 7.88 miles. It stated the Project would reduce the size of

habitats, cultural resources, and resource areas. [¶] • A transportation network of public transit, Managed Lanes and highways, local streets, bikeways, and walkways built and maintained with reasonably expected funding. [¶] • Managing demands on our transportation system . . . in ways that reduce or eliminate traffic congestion during peak periods of demand. [¶] • Managing our transportation system . . . through measures that maximize the overall efficiency of the transportation network. [¶] • Innovative pricing policies and other measures designed to reduce the number of miles people travel in their vehicles, as well as traffic congestion during peak periods of demand."

required infrastructure improvements and the number and length of car trips, while increasing community livability and preserving open space.

As to land use, the EIR pointed out additionally the Project has a variety of housing densities and levels of affordability; it would connect the Harmony Grove Village commercial area with the Project's residential areas, park and commercial uses so as to contribute to the pursuit of healthy lifestyle choices (walking and biking) promoted by the regional plan; it would cluster development in portions of the site to preserve a large area of permanent open space; and it would enhance water resources through enhancements to Escondido creek. The EIR stated the Project would not be in conflict with San Diego Forward's objectives, and potential impacts associated with the regional plan and policies would be less than significant. It stated "[t]he Project could be included in the next update of both the Sustainable Communities Strategy and the [regional transportation plan] as contained in San Diego Forward." In responses to comments related to the Project's increased density, County cited and incorporated by reference a San Diego Regional Chamber of Commerce website containing housing information showing it was only projected to issue building permits for 26 percent of the over 22,000 units allocated to it, and thus was behind in projected housing. It explained that the issue was where the housing would be located, and that the analysis of the Project's efforts to reduce vehicle emissions through design, location and minimization of off-site vehicle trips complied with County's efforts to reduce sprawl and associated emissions. County stated the Project's exclusion from the forecasted land use development patterns contained in the 2050 regional transportation plan was not dispositive of the Project's consistency with Senate Bill No. 375, because sustainable communities strategies do not control or regulate land use. It

64

stated it was appropriate and reasonable to consider the Project's consistency with the Act's policies as well as the 2050 regional plan's policies and its relationship to the greenhouse gas reduction targets identified by the Air Resources Board.

In their trial brief, respondents contended the EIR was incorrect in its conclusion and unsupported by substantial evidence; they pointed out the EIR admitted the Project site was not identified for development in the San Diego Forward plan, and characterized it as a "plain inconsistency between the Project and San Diego Forward, again based on County's prior determination that the Project site was not suitable for dense development." Characterizing San Diego Forward as a "land use plan," they suggested the EIR was inadequate for failing to consider the consistency of the Project's land use with the patterns set out in San Diego Forward. The trial court ruled County had not shown consistency with the plan; that the EIR did not contain evidence or information to support County's assertions that development and population growth were less than anticipated such that San Diego Forward could accommodate the Project.[20]

Appellant contends substantial evidence supports County's finding that any impact was only on "paper" as with the RAQS. It asserts the trial court was incorrect in concluding the EIR omitted evidence of any population shortfall; that the information appeared in County's responses to comments, where County stated it was only projected to issue building permits for 26 percent of the 22,412 units it had planned by 2020. It also contends that

---

[20] Respondents did not argue that the Project's impact with regard to greenhouse gas emissions rendered it inconsistent with San Diego Forward (nor do they make such an argument on appeal); thus any such claim is waived. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 354.)

applying the proper standard—whether the Project would obstruct San Diego Forward's implementation—we must conclude the Project is consistent: the EIR evaluated the associated land uses; reflects County's effort to move future development closer to cities, shopping and employment centers;, shows the Project is consistent with vehicle mileage projections; and encourages local walking in keeping with the plan.

An EIR's discussion of a project's consistency with regional plans includes regional transportation plans, as San Diego Forward is here. (*Golden Door*, *supra*, 50 Cal.App.5th at p. 540.) We presume the EIR is adequate, and the plaintiff in a CEQA action has the burden to prove otherwise. (*Stop Syar Expansion v. County of Napa*, *supra*, 63 Cal.App.5th at p. 450.) Thus, in reviewing the EIR's finding for substantial evidence, " 'we presume [County's] findings are correct and resolve all conflicts and reasonable doubts in favor of the findings.' " (*Golden Door*, *supra*, 50 Cal.App.5th at p. 540.) "Substantial evidence in a CEQA case is 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . . Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*Ibid*.) We accord great deference to a proper consistency finding, and reverse it only if "no reasonable person could have reached the same conclusion." (*Stop Syar Expansion*, *supra*, 63 Cal.App.5th at p. 461; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.) Our " ' "role 'is simply to decide whether the [County] officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' " ' " (*Stop Syar Expansion*, at p. 461.)

66

We conclude County officials did so here. We cannot say respondents met their burden below to show that County unreasonably determined the Project was consistent with San Diego Forward based on all of the evidence in the administrative record, which includes County's responses to comments. (Accord, *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 516-517 [lead agency's response to comments is an integral part of the EIR]; Guidelines, § 15150, subd. (a) [EIR may incorporate publicly available documents by reference].) Stated another way, it is not the case that no reasonable person could conclude the Project is compatible with, and does not frustrate. the plan's goals and objectives. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 412.)

Contrary to respondents' argument below, San Diego Forward with its Sustainable Communities Strategy is not a land use plan, nor does it supersede land use authority, rather, it is a blueprint or a "reference document" evaluating the intersection of land use and transportation patterns with the target of reducing greenhouse gas emissions. The omission of the Project's increased density in San Diego Forward's forecasts does not create inconsistency if the County reasonably found the Project otherwise concentrates its growth appropriately and designs its community to better integrate land use and transportation so as to make the region more environmentally sustainable, as is the regional plan's goal. Further, even if the Project's density was critical to the question of consistency, the County's San Diego Regional Chamber of Commerce statistics show issued building permits for County were much lower than County's allocated units (only 26 percent of allocated units), such that the projected housing in the Project would not adversely impact the plan's goals concerning the placement of communities, traffic congestion and other transportation-related issues.

Because the EIR did not violate CEQA in determining that the Project was consistent with San Diego Forward, its analysis was adequate. While, as stated above, an EIR must address any inconsistencies with applicable regional plans, it is *not* required to undertake an analysis if the project is *consistent* with the relevant plan. (*Stop Syar Expansion v. County of Napa, supra*, 63 Cal.App.5th at p. 460; *The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 894; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 633 [CEQA does not require an EIR to provide a detailed discussion of a project's consistency with a plan].)

### V. *Consistency with General and Community Plans*

In approving the Project, County found the Project "is consistent with the San Diego County General Plan and the San Dieguito Community Plan in that the goals, objectives and policies of all the elements of the plans have been or will be met." Respondents argued below that the Project was facially inconsistent with policies in both of these plans—a General Plan policy for affordable housing and a Community Plan on-site septic system requirement for new development, and thus County's approval is invalid.

### A. *Standards for Evaluating Consistency*

General land use plans have been described as the " 'constitution for all future developments' " within a county. (*Citizens of Goleta Valley v. Board of Supervisors, supra*, 52 Cal.3d at p. 570.) Typically, general and specific plans set forth policies and goals rather than specific mandates or prohibitions. (*Holden v. City of San Diego, supra*, 43 Cal.App.5th at p. 411.) For broad policies and goals, a project need not conform perfectly to be consistent. (*Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91, 100; *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors*

68

(1998) 62 Cal.App.4th 1332, 1341 (FUTURE).) " '[G]eneral and specific plans attempt to balance a range of competing interests.  It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan . . . .  It is enough that the proposed project will be *compatible with* the objectives, policies, general land uses and programs specified in the applicable plan.' " (*Holden*, at p. 412.)

A project will nevertheless be "inconsistent if it conflicts with a general plan policy that is fundamental, mandatory, and clear."  (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782; see also *FUTURE, supra,* 62 Cal.App.4th at p. 1338.)  " '[T]he nature of the policy and the nature of the inconsistency are critical factors to consider' " because "general consistencies with plan polices cannot overcome 'specific, mandatory and fundamental inconsistencies' with plan policies."  (*Clover Valley Foundation v. City of Rocklin, supra,* 197 Cal.App.4th at p. 238; *Spring Valley Lake Assn. v. City of Victorville, supra*, 248 Cal.App.4th at p. 101; *FUTURE*, at p. 1341.)  In such cases, a contrary consistency finding will be unsupported by substantial evidence.  (See *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 518.)

A public agency's determination that a development approval is consistent with its general plan is "fundamentally adjudicatory."  (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155.)  "In such circumstances, a consistency determination is entitled to deference as an extension of a planning agency's ' "unique competence to interpret [its] policies when applying them in its adjudicatory capacity." '  [Citation.] Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion."  (*Ibid.*; see *Holden v. City of San Diego, supra*, 43 Cal.App.5th at p. 412.)

69

B. *The Project Is Inconsistent with County's Goals and General Plan Policies*
*for Affordable Housing*

As indicated, the vision of County's General Plan includes a "village" model as one choice for its communities. The General Plan describes such villages as containing "a mix of housing types that are located near retail businesses, employment, schools, parklands, churches, and public institutions" and states, the "villages will vary in density and character that will provide affordable housing choices . . . ." Affordable housing is further addressed in the General Plan's Housing Element. It states at the outset that the State identifies "provision of decent and affordable housing for every Californian as a statewide goal." The General Plan explains that under the state Housing Element Law, its housing element "must contain local commitments to . . . [¶] . . . [¶] [a]ssist in the development of adequate housing to meet the needs of lower and moderate income households." The General Plan lists as a "Guiding Principle[ ]" of "particular significance" the "objective[ ] of improving housing affordability."[21]

The General Plan's housing element recites its goal of having "[a] housing stock comprised of a variety of housing and tenancy types at a range of prices, which meets the varied needs of existing and future unincorporated County residents, who represent a full spectrum of age, income, and other

_____

[21] The state "Housing Element Law," overviewed in *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 444-445, in part provides that " '[l]ocal and state governments have a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community[.]' " (*California Building Industry Assn.*, at p. 445, quoting Gov. Code, § 65580, italics omitted.) The court in *California Building Industry* set out the California law definitions of extremely low to moderate income households, which apply absent applicable federal standards. (*Id.* at p. 447, fn. 3.)

demographic characteristics." One of several supporting policies is housing element policy H-1.9, which reads: "Affordable Housing through General Plan Amendments. Require developers to provide an affordable housing component when requesting a General Plan amendment for a large-scale residential project when this is legally permissible."[22]

County planning department staff acknowledged that based on the Project's density of eight units per acre, it was "not defined as moderate to low income housing by the . . . General Plan." Staff found the Project nevertheless consistent with the General Plan, and particularly policy H-1.9, even though the Project required a general plan amendment but did not have an affordable housing component: "The project does not conflict with this policy. Consistent with other General Plan Amendment projects approved by the County Board of Supervisors since the adoption of the General Plan on August 3, 2011, the project does not include an affordable housing component as the County of San Diego does not have an inclusionary housing ordinance or other legal mechanism to require affordable housing units."

The superior court disagreed: "County provides no authority that an ordinance is required before it can require affordable housing. Since the County has not shown that it is legally precluded from requiring developers to provide an affordable housing component when requesting a [general plan amendment], its failure to do so here is inconsistent with Policy H-1.9."

Appellant contends County's General Plan consistency determination is entitled to deference; that policy H-1.9 is not fundamental, mandatory or

_____

[22] Other policies include, for example, "[s]upport[ing] the design of large-scale residential developments (generally greater than 200 dwelling units) in Villages that include a range of housing types, lot sizes, and building sizes"; and "[p]romot[ing] large-scale residential development in Semi-Rural that include a range of lot sizes to improve housing choice."

71

clear, but one of many policies that must be balanced together with one another. It points out the policy "refers to a Project's 'component' but does not specify a number of units or price level." According to appellant, "[t]he Project contains a naturally affordable component: smaller units as part of a range of housing sizes." It points to County staff's assertion that " '[i]n terms of housing affordability, multi-family units as well as smaller lots and house sizes tend to be more affordable' " and explains the project will have a variety of sizes and lots, including a 1,462 square foot lot with 800 square feet of living space. Appellant argues this satisfies the General Plan and its housing element. Additionally, appellant maintains that placing an affordable housing condition on the Project without an inclusionary housing ordinance would have required County to impose a specific condition on a subdivision map, which was "not legally permissible" as both unconstitutional and in violation of the Subdivision Map Act.

As we have stated, we give "great deference" to this finding of consistency; we simply decide " ' "whether the . . . officials considered the applicable policies and the extent to which the proposed project conforms with those policies." ' " (*Holden v. City of San Diego*, *supra*, 43 Cal.App.5th at p. 412.) We may reverse the finding only if it is based on evidence from which no reasonable person could have reached the same conclusion. (*Ibid*.) However, we conclude that County unreasonably found that the Project, which it acknowledged did not include any affordable housing within the meaning of the General Plan, furthered the General Plan's vision, policies and objectives of providing affordable housing choices in villages (villages "that *will* provide affordable housing choices," italics added). This is particularly evident when policy H-1.9 of the General Plan *requires* developers seeking a general plan amendment, as appellant is here, to

72

include an affordable housing component when legally permissible.[23]  The word "require" involves " 'a compulsion or command upon (as a person) to do something.' " (*Sully-Miller Contracting Co. v. California Occupational Safety & Health Appeals Bd.* (2006) 138 Cal.App.4th 684, 695.)  The policy is in keeping with County's housing element's obligation under the State Housing Law (Gov. Code, § 65583, subd. (c)(2)) to contain "local commitments" to assist in meeting the needs of lower and moderate income households.  The General Plan provides that its policies are "written to be a clear statement of policy but also to allow flexibility when it comes to implementation [and] must be balanced with one another . . . ."  But when the policies and goals include a commitment to increase the supply of affordable housing for large scale residential projects like the Project here, the absence of any affordable housing component is inconsistent and nonconforming to those policies.

We further hold County unreasonably concluded it could not legally impose a development condition for an affordable housing component without a duly enacted inclusionary housing ordinance.  In our view, that question presents a purely legal issue requiring no deference to County's determination.  (*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 ["If the agency's determination 'involves pure questions of law, we review those questions de

---

23    We read the "when this is legally permissible" clause to refer to the state of the law in 2011 when the General Plan was updated, at which time it was unsettled whether an affordable housing requirement was an "exaction" for which a local government would have been required to pay just compensation under the takings clause.  That controversy was settled in 2015 when the California Supreme Court decided *California Building Industry Assn. v. City of San Jose, supra,* 61 Cal.4th 435, and upheld the validity of a municipality's affordable housing regulation (an inclusionary housing ordinance) as not an exaction, but a permissible regulation of land use under the exercise of the local agency's police power.  (*Id.* at pp. 457, 461.)

novo' "].)  The position was unavailing in view of the primacy of the General Plan—the adoption of which is a legislative act—on land use and development.  (See *Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152-153; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773; *Molloy v. Vu* (2019) 42 Cal.App.5th 746, 758.)  The general plan is the " ' "constitution" for future development' " within a city or county "located at the top of 'the hierarchy of local government law regulating land use.' " (*DeVita*, at p. 773; *Carson Harbor Village, Ltd. v. City of Carson* (2015) 239 Cal.App.4th 56, 62 [general plan is the basic charter governing the direction of future land use within a locality].)  Ordinances are subsidiary enactments that must be consistent with the general plan or else be invalid.  (*Orange Citizens*, at p. 153; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 541 ["The general plan is the charter to which the [zoning and development code] must conform"; "The tail [the planning and zoning law] does not wag the dog [the general plan]"]; *Denham, LLC v. City of Richmond* (2019) 41 Cal.App.5th 340, 353.)

Appellant asserts an affordable housing component for this Project would be legally impermissible in the absence of an ordinance because "County would have had to craft a specific condition for this Project based on how the Project would *create* a problem whose solution was such a condition," rendering the condition unconstitutional.  For this proposition, appellant cites *California Building Industry Assn. v. City of San Jose*, *supra*, 61 Cal.4th at pages 470-471, where the court rejected the building industry's argument that *San Remo Hotel L.P. v. City And County Of San Francisco* (2002) 27 Cal.4th 643 held that inclusionary housing conditions would be valid only if they " 'bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development.' " (*California Building*

74

*Industry*, at p. 471, italics omitted.) The court in *California Building Industry* explained that *San Remo* involved development mitigation fees, unlike the housing ordinance at issue in that case. We perceive no support for appellant's constitutional challenge in the cited portion of *California Building Industry*.

We finally reject appellant's assertion, based on Government Code section 66474.2,[24] that a specific affordable housing condition would violate the Subdivision Map Act. The cited Map Act provision requires a local agency to apply *policies* in effect, as the General Plan policies have been since 2011, when an application for tentative map is complete.

C. *Community Plan's Septic Requirement*

The Community Plan separately describes the communities of Harmony Grove and Elfin Forest. It contains a map showing Elfin Forest in relation to the boundary of Harmony Grove,[25] and explains that Elfin Forest is "surrounded by" Harmony Grove to the east. The Community Plan states that Elfin Forest is developed with custom single-family homes that "must be located on lots no smaller than two acres and must utilize septic systems for sewage management." In keeping with this requirement, the Community Plan's policy LU-1.1.3 provides: "Any and all development in Elfin Forest

---

[24] Government Code section 66474.2 provides in part: "(a) Except as otherwise provided in subdivision (b) or (c), in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, *policies*, and standards in effect at the date the local agency has determined that the application is complete pursuant to Section 65943 of the Government Code." (Italics added.)

[25] The plan states that "[t]he community of Elfin Forrest [*sic*] does not have an established Village or Rural Village boundary."

75

must be served only by septic systems for sewage management to ensure the preservation of the community's rural character."

The superior court found the Project "fundamentally conflicts" with this policy, ruling: "[T]he . . . Project is conditioned on annexation of the site into a sewer district. The County argues that the Community Plan is being amended to expand the existing Harmony Grove Village so that the site is now covered by the Specific Plan for Harmony Grove Village South which expressly calls for using a sewage treatment plant. However, re-designating the area so that it is covered by a less restrictive community plan still conflicts with Policy LU-1.1.3 by disregarding the requirement that Elfin Forest only be served by septic systems."

Appellant contends Policy LU-1.1.3 does not apply: "The San Dieguito Community Plan covers two distinct planning areas, one known as Elfin Forest and the other known as Harmony Grove, and the Project is in Harmony Grove. . . . Policy LU-1.1.3 . . . is part of the Community Plan's rules for *Elfin Forest*, not Harmony Grove. [¶] . . . [¶] There is no such language governing Harmony Grove, so this septic policy never applied to the Project."

Appellant is correct. The EIR makes clear that the Project is within the *Harmony Grove community*, not the Elfin Forest community. The "Project Location" section states the "Project is located in the unincorporated portion of northern San Diego County, immediately west of City of Escondido boundaries *in the community of Harmony Grove*. . . . The community of Elfin Forest is located approximately 4 miles to the west." (Italics added.) It makes clear the *entire Project site* is within that community: "The [Elfin Forest and Harmony Grove portion of the San Dieguito] Community Plan covers the planning areas of Elfin Forest and Harmony Grove, which total

76

approximately 6,793 acres in size. *The entire Project site is located within the Harmony Grove community*." (Italics added.)

Though the EIR states the Project site "would be required to be annexed . . . into an existing Sanitation District for sewer service," the site is not subject to the Elfin Forest septic policy, thus the annexation does not conflict with the Community Plan.

Respondents disagree, saying a portion of the Project site was within Elfin Forest prior to the boundary line amendment. They cite to a portion of the Planning Commission Hearing Report that reads: "The entire project site is located within the Elfin Forest-Harmony Grove Subarea of the San Dieguito Community Plan Area. As part of the [general plan amendment], the Elfin Forest-Harmony Grove Subarea Plan will be amended to modify Policy LU-2.2.1, to add associated text changes and to add the project to Chapter 6, the Harmony Grove Village Specific Plan Area (SPA). Figures 1 and 3 of the Elfin Forest-Harmony Grove Subarea plan will be amended to add the project within the village boundary line."

That the Project is within the subarea plan area does not establish that any of the Project lies within the separate Elfin Forest community. Rather, as stated, the EIR makes clear that the "entire Project site" is within the Harmony Grove community. Respondents also cite to a map showing the Project in relation to the existing Harmony Grove Village. That map does not show the Elfin Forest boundary or contradict the EIR's statements as to the Project location. There is no substantial evidence that the Project conflicts with Community Plan Policy LU-2.2.1.

DISPOSITION

As in *Golden Door*, *supra*, 50 Cal.App.5th 467, the final judgment in this case is based on the trial court's findings and determinations, some of which are erroneous.  Accordingly, on remand, the court is directed to amend its minute order, issue a new writ of mandate and judgment, and conduct further proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


AARON, J.


IRION, J.